# In the United States Court of Federal Claims

No. 15-1249C
Filed: February 28, 2018

| | |
|---|---|
| *************************************** | |
| * | 5 C.F.R. §§ 551.101(c) (General); |
| * | 551.104 (Definitions); 551.202 |
| * | (General Principles); 551.206 |
| * | (Administrative Exemption |
| * | Criteria); 551.401(a) (Basic |
| NADIA ABOU-EL-SEOUD, * | Principles); 551.402(a) (Agency |
| * | Responsibility); |
| Plaintiff, * | Fair Labor Standards Act of 1938, |
| * | 29 U.S.C. §§ 201–219 (2012); |
| v. * | Portal-to-Portal Act of 1947, 29 |
| * | U.S.C. § 255(a) (2012); |
| THE UNITED STATES, * | Rules of the United States Court of |
| * | Federal Claims 8(c) (Affirmative |
| Defendant. * | Defense); 30(b)(6) (Notice or |
| * | Subpoena Directed to an |
| * | Organization); 56(c) (Summary |
| * | Judgment); |
| * | Statute of Limitations, 28 U.S.C. |
| * | § 2501 (2012). |
| *************************************** | |

**Michal B. Shinnar,** Gary M. Gilbert & Assocs., Silver Spring, Maryland, Counsel for Plaintiff.

**Joseph Alan Pixley,** United States Department of Justice, Washington, D.C., Counsel for the Government.

## MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**BRADEN,** *Chief Judge.*

This case concerns whether the Government, in failing to assert an affirmative defense under the Fair Labor Standards Act of 1938 ("FLSA"), waived that defense for the purposes of Plaintiff's Motion for Partial Summary Judgment, and whether Plaintiff has established the absence of a genuine issue of material fact as to whether she worked overtime hours, for which the Government willfully did not compensate her. For the reasons discussed herein, Plaintiff's Motion For Partial Summary Judgment is denied.

To facilitate review of this Memorandum Opinion And Order, the court has provided the following outline:

I.      RELEVANT BACKGROUND.
        A.      The Fair Labor Standards Act.
        B.      The United States Army Corps Of Engineers' Overtime Policy.
        C.      Plaintiff's Employment With The United States Army Corps Of Engineers.

II.     PROCEDURAL HISTORY.

III.    DISCUSSION.
        A.      Jurisdiction.
                1.      Governing Precedent.
                2.      Statute Of Limitations.
                        a.      The Government's Argument.
                        b.      Plaintiff's Response.
                        c.      Plaintiff's Reply.
                        d.      The Court's Resolution.
        B.      Standing.
        C.      Standard Of Review Under RCFC 56.
        D.      Plaintiff's Motion For Partial Summary Judgment.
                1.      Whether The Government Waived The Affirmative Defense Of
                        Exemption From The Fair Labor Standards Act.
                        a.      Plaintiff's Argument.
                        b.      The Government's Response.
                        c.      Plaintiff's Reply.
                        d.      The Court's Resolution.

                2.      Whether Plaintiff's GS-11 Technical Writer Position Was Exempt From
                        The Fair Labor Standards Act.
                        a.      Plaintiff's Argument.
                        b.      The Government's Response.
                        c.      Plaintiff's Reply.
                        d.      The Court's Resolution.
                                i.      The Relevant Statutory And Regulatory Requirements
                                        Governing Whether An Employee's Duties Are Subject To
                                        The Fair Labor Standards Act Or Exempt.
                                ii.     There Are Sufficient Facts Before The Court To Determine
                                        Whether Plaintiff Was Exempt From The Fair Labor
                                        Standards Act.
                                iii.    Plaintiff Failed To Establish That She Is Entitled To
                                        Summary Judgment As To The Issue Of Exemption.

3.     Whether Plaintiff Is Entitled To Compensation For Alleged Overtime Hours.

     a.     Plaintiff's Argument.

          i.     Fort Worth.

          ii.     Lunch Breaks.

          iii.     Dinners And Travel In Washington, D.C.

          iv.     Conferences.

          v.     Vacation In France.

          vi.     Vacation In Greece.

     b.     The Government's Response.

          i.     Fort Worth.

          ii.     Lunch Breaks.

          iii.     Dinners And Travel In Washington, D.C.

          iv.     Conferences.

          v.     Vacation In France.

          vi.     Vacation In Greece.

     c.     Plaintiff's Reply.

     d.     The Court's Resolution.

IV.     CONCLUSION.

## I.       RELEVANT BACKGROUND.[1]

### A.       The Fair Labor Standards Act.

The Fair Labor Standards Act of 1938 ("FLSA") states that, unless otherwise provided,

> no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).

In 1974, Congress amended the FLSA to extend overtime provisions to federal employees. *See* 29 U.S.C. § 203(e)(2)(A).[2]   In addition, Congress authorized the Office of Personnel Management ("OPM") to issue any regulation required to implement this amendment.   *See* 29 U.S.C. § 204(f).   In lieu of overtime compensation, federal employees may receive compensatory time, at a rate of one and one-half hours per extra hour worked.   29 U.S.C. § 207(o)(1).[3]

---

[1] The facts discussed herein are derived from: the October 26, 2015 Complaint ("Compl."); exhibits submitted with Plaintiff's June 30, 2017 Motion For Partial Summary Judgment ("Pl. Mot. Exs. 1–45"); the erratum exhibit filed July 10, 2017 ("Pl. Mot. Supp. Ex. 11"); exhibits submitted with the Government's October 6, 2017 Response ("Gov't App."); exhibits submitted with Plaintiff's November 6, 2017 Reply ("Pl. Reply Exs. 1–2"); and the signed copy of Exhibit 17 filed February 22, 2018 ("Pl. Mot. Supp. Ex. 17").   The facts are not disputed, unless otherwise noted.

[2] This section provides that, for the purposes of the FLSA, "employee" includes

> any individual employed by the Government of the United States—
> > (i) as a civilian in the military departments . . .
> > (ii) in any executive agency . . .
> > (iii) in any unit of the judicial branch of the Government which has positions in the competitive service,
> > (iv) in a nonappropriated fund instrumentality under the jurisdiction of the Armed Forces,
> > (v) in the Library of Congress, or
> > (vi) the Government Publishing Office[.]

29 U.S.C. § 203(e)(2)(A).

[3] This section provides that federal employees may receive, "in lieu of overtime compensation, compensatory time off at a rate not less than one and one-half hours for each hour

The FLSA, however, exempted certain employees from receiving overtime under Section 207(a)(1). *See* 29 U.S.C. § 213. Specifically, federal employees who are "employed in a bona fide executive, administrative, or professional capacity" are exempt from such overtime requirements. *See* 29 U.S.C. § 213(a)(1). Pursuant to OPM regulations, however, a federal employee is presumed not to be exempt from the requirements of the FLSA, but an employer may overcome that presumption by proffering evidence to establish the elements of a claimed exemption. *See* 5 C.F.R. § 551.202(a),[4] (c).[5]

## B.    The United States Army Corps Of Engineers' Overtime Policy.

The United States Army Corps of Engineers' ("Army Corps") overtime policy[6] provides that employees who are classified as exempt from the FLSA are paid "hour-for-hour overtime," since "[b]asically, an exempt employee is a salary employee." Pl. Mot. Ex. 10 at 16. Non-exempt employees receive "time and a half," but only if they request overtime. Pl. Mot. Ex. 10 at 16. To request overtime, employees "will put in documentation to request in advance overtime from their supervisor and get the signature to approve it." Pl. Mot. Ex. 10 at 17. The overtime documentation

---

of employment for which overtime compensation is required by this section." 29 U.S.C. § 207(o)(1).

[4] 5 C.F.R. § 551.202(a) provides:

Each employee is presumed to be FLSA nonexempt unless the employing agency correctly determines that the employee clearly meets the requirements of one or more of the exemptions of this subpart and such supplemental interpretations or instructions issued by OPM. The agency must designate an employee FLSA exempt when the agency correctly determines that the employee meets the requirements of one or more of the exemptions of this subpart and such supplemental interpretations or instructions issued by OPM.

5 C.F.R. § 551.202(a).

[5] 5 C.F.R. § 551.202(c) provides that "[t]he burden of proof rests with the agency that asserts the exemption." 5 C.F.R. § 551.202(c).

[6] The Army Corps apparently does not have a written overtime policy. Instead, the policy was set forth in an April 5, 2017 Rule of the United States Court of Federal Claims ("RCFC") 30(b)(6) deposition, on behalf of the Army Corps. Pl. Mot. Ex. 10; Gov't App. at A72–81. RCFC 30(b)(6) provides that, where a party notices or subpoenas a governmental agency for a deposition and describes, with "reasonable particularity[,] the matters for examination," an agency "must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf[.]" RCFC 30(b)(6). In that deposition, the designated individual "must testify about information known or reasonably available to the organization" that is within the scope of its testimony. *See* RCFC 30(b)(6). In this case, the Army Corps designated Karen Robinson, who is the "[D]ivision [F]inance [O]fficer for the [Army Corps'] Southwestern Division and who conducts audits of overtime and pay issues in her official capacity," to state the overtime policy. Gov't Resp. at 30; *see also* Pl. Mot. Ex. 10.

must "state why [the project for which overtime is requested] is 'mission critical,'[7] why it cannot be done during normal business hours," and be submitted to the employee's supervisor.  Pl. Mot. Ex. 10 at 17 (internal quotation marks added).  A supervisor then reviews the employee's request and determines whether the overtime is necessary or whether work assigned can be done the following day or later.  Pl. Mot. Ex. 10 at 17–18.  If an overtime request is approved, the federal employee may perform the work and receive overtime; otherwise, the employee must wait until the following day or later to perform the work.  Pl. Mot. Ex. 10 at 18.

Although the Army Corps requires overtime requests to be submitted in advance, on occasion, employees may submit requests within 24 hours after completing the work for the supervisor to review and determine whether the work was "mission critical."  Pl. Mot. Ex. 10 at 26–27, 30.

But, even if an employee does not submit an overtime request within 24 hours, a supervisor has the discretion to approve a request, provided that: (1) the employee explains why the work was "mission critical;" (2) the explanation provides why the request is late; and (3) the employee notified a supervisor, prior to working the overtime.  Pl. Mot. Ex. 10 at 31.  Nevertheless, overtime requests are the employee's responsibility.  Pl. Mot. Ex. 10 at 54.  When employees request authorization to perform additional work, they must indicate whether they wish to be compensated with overtime pay or compensatory time, *i.e.*, paid time off, but again, a supervisor has the discretion to determine whether the additional work will be compensated with overtime pay or compensatory time.  Gov't App. at A77 ("[The employee] can state if they want to earn overtime or comp[ensatory] time[, but the supervisor has the final say].");  *see also* Gov't App. at A61 (3/20/17 first-line supervisor[8] testifying that "GS-10s and under were supposed to take overtime unless they specifically [requested] comp[ensatory] time.").

## C.   Plaintiff's Employment With The United States Army Corps Of Engineers.

In May 2011, Nadia Abou-el-Seoud joined the Army Corps, as a full-time GS-9 Project Coordinator at the Forth Worth, Texas office to support the Combat Readiness Support Team ("CRST").[9]  Compl. ¶ 3.  CRST employees are "individually selected to deliver[] time sensitive

---

[7] "Mission critical" means work necessary for "an emergency-type situation, a [Federal Emergency Management Agency] mission, a wartime mission . . . things like that."  Gov't App. at A80–81.  Mission critical work cannot wait until the next day.  Pl. Mot. Ex. 10 at 26–27, 30.

[8] For ease of identification, the court refers to Plaintiff's three supervisors as her "first-line supervisor," "second-line supervisor," and "third-line supervisor."  *See* Pl. Mot. Ex. 3 at 26 (identifying first-line and second-line supervisors); Gov't App. at A47 (identifying third-line supervisor).

[9] In March 2011, before Ms. Abou-el-Seoud joined the CRST, the Army Corps completed a Manpower Study that described "[a]ll CRST personnel [as] virtually available and on-call 7-days a week through the use of Government issued digital messaging devices (blackberries) and notebook computers."  Pl. Mot. Ex. 2 at 34; Pl. Mot. Supp. Ex. 17.  In addition, overtime was determined not to be

analyses, assessments, evaluations, and/or adjudication of issues" to the Secretary of the Army, Army staff, the Office of the Assistant Chief of Staff for Installation Management, and Army Corps Headquarters. Pl. Mot. Ex. 2 at 34. Ms. Abou-el-Seoud's co-worker testified that she was "hired on . . . as a member of our team to provide journalistic support." Pl. Mot. Ex. 1 at 29 (3/28/17 co-worker A testimony).

In March 2013, Ms. Abou-el-Seoud was promoted to a GS-9 Technical Writer position. Compl. ¶ 5. In May 2013, Ms. Abou-el-Seoud was promoted to a GS-11 Technical Writer position. Compl. ¶ 6. In August 2014, Ms. Abou-el-Seoud allegedly resigned from her Technical Writer position. Compl. ¶ 7.[10]

The Army Corps classified Ms. Abou-el-Seoud's GS-9 Project Coordinator and GS-9 Technical Writer positions as non-exempt from the requirements of the FLSA, but classified her GS-11 Technical Writer position as exempt. Compl. ¶¶ 9–11.

The Position Description ("PD") for Ms. Abou-el-Seoud's GS-11 Technical Writer position states:

> Serves as a Technical Writer-Editor with responsibility for writing, editing reviewing, and publishing engineering documents. Publications include a variety of reports, assessments, proposals, memorandum, work plans, reconnaissance and feasibility reports, scopes of work, design documentation reports, environmental assessments and impact statements, general and limited reevaluation reports, fact sheets, operation-and-maintenance manuals, and brochures for proposed, current,

---

fiscally feasible to compensate CRST personnel due to mandated allowance thresholds and the high grade status of CRST subject matter experts (SMEs). CRST personnel average 50-60 hour workweeks on any given manyear and are not fully compensated for the actual time expended to meet delivery of tasks and functions. As such, while the use of the 1740 [hour] work year is used in this package, it is an artificial limit that does not account for the workload and demand required to fully meet mission parameters and statutory reporting requirements for [Military Construction] execution.

Pl. Mot. Ex. 2 at 34.
This study reported that some members of the CRST work hundreds of hours over the 1,740 estimated for typical forty-hour workweeks. Pl. Mot. Ex. 2 at 35–36. But, because the study was completed prior to Ms. Abou-el-Seoud's employment with the Army Corps, she was not "counted towards the overall manpower calculations." Pl. Mot. Supp. Ex. 17 ¶ 6.

[10] The Government disputes this allegation, as evidenced by Ms. Abou-el-Seoud's certified time and attendance records that reflect that she worked regular hours, teleworked, was on temporary duty, or took compensable leave during different pay periods from August 25, 2014 to October 31, 2015. Gov't Ans. ¶ 7; *see also* Pl. Mot. Ex. 9. Approximately seventeen pay periods during this time were not certified by Ms. Abou-el-Seoud and do not reflect whether she was working or on compensable leave. Pl. Mot. Ex. 9.

and completed projects.  The purpose of the documents is to present and interpret technical data, explain results and procedures, and provide rationale for recommended actions.  The position requires general knowledge such as civil and military engineering, operations, hydrology, geology, environmental sciences, real property acceptance and excess procedures or other complex technical subject matters and an understanding of project-related social, environmental, and economic considerations.  Participation in project-related meetings and conferences and project site visits is required.

Gov't App. at A2.

The PD also listed such duties as "obtain[ing], analyz[ing], and verify[ing] information" and "research[ing], analyz[ing], and distill[ing] technical data for a variety of technical fields and present[ing] the information in written format as appropriate for the skill level of the intended audience."  Gov't App. at A3.  In addition, the PD described the Technical Writer position as one that has "a great deal of independence . . . with minimal supervisory oversight," and requires the employee to "use judgment to adapt or modify guidelines to fit the task at hand," and "research, analy[ze], and interpret[] . . . information on a variety of subjects."  Gov't App. at A4.

Ms. Abou-el-Seoud's Technical Writer duties appear to have been "split between working on the [Army Corps'] communications network and drafting reports on combat vehicles."  Compl. ¶ 112.  In addition, she assumed administrative duties that "were not part of her job description" and required "about 30 to 40 percent of her time."  Compl. ¶¶ 113–14.  These administrative duties included making travel arrangements for Army Corps employees and taking notes during meetings.  Pl. Mot. Ex. 5 at 140 (3/21/17 third-line supervisor testifying that Ms. Abou-el-Seoud made travel arrangements and took notes, but he did not know how much time she spent on such tasks).  Another member of the CRST testified that Ms. Abou-el-Seoud was required to research information about certain combat vehicles and write reports about those vehicles. Pl. Mot. Ex. 1 at 72 (3/28/17 co-worker A[11] testifying: "We have these things called support facility annexes so that when a materiel is developed, like a tank or whatever, we have to determine the impact of that new vehicle or whatever on our facilities. . . . [T]he agency that makes that piece of equipment has to get with the [Army Corps] and develop the support facility annex . . . and so [Ms. Abou-el-Seoud] was working on some of those for the team.").[12]  But, other members of the CRST testified

---

[11] For ease of identification, the court distinguishes Plaintiff's co-workers by identifying them as "co-worker A," "co-worker B," and "co-worker C."

[12] Ms. Abou-el-Seoud's first-line supervisor testified about these determinations in greater detail:

Q: What is [the CRST]?

A: It's a team that looks at what the military will be fielding in air and ground vehicles in the future to try and develop facility requirements.

Q: What do you mean by facility requirements?

that they were not aware of Ms. Abou-el-Seoud's job duties. Pl. Mot. Exs. 1 at 73 (3/28/17 co-worker A testifying that other than travel arrangements and technical reports, he did not know what she was working on), 4 at 15–16 (3/27/17 co-worker C testifying that she did not "know the extent of all [Ms. Abou-el-Seoud's] duties"). Although Ms. Abou-el-Seoud had several supervisors, she worked primarily with the CRST Leader. Pl. Mot. Ex. 1 at 30 (3/28/17 co-worker A testifying: "Her work assignments came from [the CRST Leader]" but "after he passed away, she took direction from me for just a couple of months, but her supervisors were down at Fort Worth, Texas."), 31 (3/28/17 co-worker A testifying that the CRST Leader had "these little bulletins and things . . . and [Ms. Abou-el-Seoud] was asked to kind of make them formal and pretty them up and that kind of stuff, but she didn't get anything that [the CRST Leader] didn't give her, from me anyway").

Ms. Abou-el-Seoud's unofficial curriculum vitae ("CV") lists her title as "Strategic Communications Officer and Project Manager for Ground Systems" and provides twenty-two bullet points describing her job duties as:

- Serve as the Strategic Communications Officer for the [CRST] which involves being the communications liaison between the Army Staff and the Army Corps . . . regarding research, reports, and communicating mission effectiveness.
- Serve as the Project Manager for Ground Systems, to include Combat Vehicles and weapon system's impact on the Army's facilities and infrastructures.
- Responsible for maintaining an effective public affairs network: responsible for preparing, editing[,] and distributing organizational publications to internal and external audiences, which include: bi-monthly newsletters, brochures, pamphlets and articles.
- Responsible for: generating and reviewing CRST generated documentation, reports, data and sensitive information, and working closely with the Chief of the CRST, Headquarters, [Army Corps] Public Affairs Team and the [Army Corps] Chicago District Public Affairs Team to ensure the creation of an effective public communications plan to deliver ongoing CRST missions.
- Developed and maintain[ed] the [CRST] website[.]

---

A: A facility that has the appropriate functionality for the vehicle it will be housing.

Q: So . . . if the military is looking at buying a certain kind of truck, you want to make sure that — the CRST would want to make sure that it had the appropriate facility to house that particular kind of truck?

A: I believe so, yes.

Pl. Mot. Supp. Ex. 11 at 15.

- Responsible for the writing, editing and transmitting [of] technical reports on existing and future Combat Vehicles, weapon systems to address specifications, operational information, and standards impacting construction and maintenance of facilities

        *        *        *

- Responsible for the research collection, and analysis of data from multiple sources to prepare technical reports to demonstrate the necessity of various programs.
- Responsible and accountable for the management of multiple projects directed toward implementation of Ground Combat Systems.  Key responsibility is to determine effectiveness of program and deadlines.

        *        *        *

- Serve as the Project Coordinator for the annual Team Offsite.  Responsible for the: delegation of regulations, budget and funding requirements, and monitoring of public awareness of the CRST mission for both Federal and non-federal agencies. Responsible for determining: offsite location, travel arrangements for team members as well as all stakeholders, and coordinating presentations of the Army and Army Corps of Engineers mission.

Gov't App. at A7–8.[13]

On an unspecified date, Ms. Abou-el-Seoud created a list of major accomplishments for Fiscal Year 2013, that listed, "research[ing], collect[ing,] and analyz[ing] CRST impacts on . . . [the Army Corps], in addition to analyzing methods to increase CRST awareness throughout federal organizations."  Gov't App. at A17.  She also cited obtaining data and developing and editing guidance documentation "to reflect CRST's mission objectives, initiatives, and progress and a one-of-a-kind matrix organization operating within the . . . Chief Engineers Office and [Army Corps Headquarters]."  Gov't App. at A17.  In addition, she stated that she "[maintained] relationships with various [Public Affairs Offices] nationwide within federal agencies . . . and [the] private [sector] to ensure the CRST [was] maximizing strategic communication capabilities."  Gov't App. at A17.

Ms. Abou-el-Seoud's regularly scheduled work hours ("tour of duty") were from 7:00 a.m. to 3:30 p.m., and included an unpaid 30-minute lunch break.  Pl. Mot. Ex. 6 at 28.  Ms. Abou-el-Seoud, however, generally began her workday at 7:30 a.m. (Gov't App. at A21 ("My normal time was around 7:30 at the Fort Worth office.")) and, on some occasions, began her day even later. *See, e.g.*, Gov't App. at A87 (9:19 a.m. email message stating: "Just got here[.]"), A90 (8:34 a.m. email message stating: "I just walked in.  I was really tired again."), A91 (9:42 a.m. email message stating: "I can't do lunch today because I have a deadline for 1300 and I got here late . . . again[.]"). Ms. Abou-el-Seoud occasionally ate lunch at her desk, and sometimes ate lunch in the cafeteria.

---

[13] Ms. Abou-el-Seoud's CV did not distinguish between duties performed as a GS-9 Program Coordinator and those performed as a GS-9 and GS-11 Technical Writer.

Pl. Mot. Ex. 1 at 146 (3/28/17 co-worker A testifying: "[S]ometimes she ate at her desk, sometimes she ate in the cafeteria."). Ms. Abou-el-Seoud regularly went to the gym around 4:00 p.m., but also did so "a couple times at lunch." Gov't App. at A31–32 (3/7/17 Pl. testimony); Pl. Mot. Ex. 6 at 159 (3/7/17 Pl. testimony); *see also* Gov't App. at A82–83 (3/29/17 second-line supervisor testimony). Her first-line supervisor testified that he recalled Ms. Abou-el-Seoud, "staying in the office past 3:30," but could not recall the frequency. Gov't App. at A57. Her second-line supervisor also testified that he would see her in the office between 4:00 p.m. and 5:00 p.m. Pl. Mot. Ex. 3 at 42 (3/29/17 second-line supervisor testimony). On these occasions, he would remark that she was "working too hard," because, "if her workday started at 7:00 [a.m.], she was beyond her normal workday." Pl. Mot. Ex. 3 at 75 (3/29/17 second-line supervisor testimony).

Ms. Abou-el-Seoud testified that she routinely worked until 5:30 p.m. or later, when she was working at the Army Corps' Fort Worth office. Pl. Mot. Ex. 6 at 28–29. On some occasions, her mother would visit Fort Worth and pick her up after work, around 7:30 p.m. Pl. Mot. Ex. 7 at 12 (3/8/17 Pl. mother testimony). Her sister testified that Ms. Abou-el-Seoud worked overtime on a regular basis. Pl. Mot. Ex. 8 at 13 (3/8/17 Pl. sister testifying: "I know that she started indicating that she was working additional hours when she was working in Fort Worth. . . . I don't remember a lot of details. Just that she, you know – she had to stay late some days in the office.").

As part of her duties, Ms. Abou-el-Seoud traveled approximately one week per month to other Army Corps offices when she was a GS-9 Project Coordinator and GS-9 Technical Writer, and approximately every other week when she was a GS-11 Technical Writer. Compl. ¶¶ 15, 17. Her work schedule during travel typically began around 7:00 a.m. and continued until 6:00 or 6:30 p.m. Compl. ¶¶ 51–52, 62–63;[14] *see also* Pl. Mot. Ex. 6 at 67 ("I discussed with [my first-line supervisor] that I would be staying late with [the CRST Leader]. . . . I would tell him when I returned from my trip [the CRST Leader] and I worked extra hours when we were - - when we were outside the office[]" but "[n]ot specific details. I would just inform him we worked late."). But, Ms. Abou-el-Seoud did not request overtime for these periods. Gov't App. at A20–26. And, allegedly, when Ms. Abou-el-Seoud and the CRST Leader[15] worked in Washington, D.C., he sometimes would pick her up at her hotel before work and they would travel to the office together. Pl. Mot. Exs. 6 at 158–59, 8 at 19 ("I vividly remember . . . [her] expressing that [he] would insist

---

[14] The Government disputes this allegation and others that Ms. Abou-el-Seoud worked extended hours when she traveled for work. Gov't Ans. ¶¶ 51–52, 62–63, 75–76. For example, the October 26, 2015 Complaint alleged that during her travel in October 2013, Ms. Abou-el-Seoud worked until 2:00 or 3:00 a.m. three nights per week and, from November to December 2013, worked until 1:00 a.m. three nights per week. Compl. ¶¶ 75–76. Likewise, the October 26, 2015 Complaint alleged that Ms. Abou-el-Seoud worked from 7:00 a.m. until 1:00 a.m. or 2:00 a.m., each day during a January 2014 business trip to Hawaii. Compl. ¶ 79. The Government also disputes this allegation. Gov't Ans. ¶ 79.

[15] This individual's job title is not provided in the record. Other members of the CRST described him as the "team leader of the [CRST]" (Pl. Mot. Ex. 1 at 11 (3/28/17 co-worker A testimony)) and as the "sponsor of that program [*i.e.*, the CRST]" (Pl. Mot. Ex. 3 at 26 (3/29/17 second-line supervisor testimony)). For the purposes of this Memorandum Opinion And Order, the court refers to this individual as the "CRST Leader."

on driving [her] to and from work, despite [her], you know, expressing that she, again, as a fully functional employee could take care of that herself.").

On these business trips, Ms. Abou-el-Seoud also would attend "working dinners." Pl. Mot. Exs. 6 at 67–68 ("And then there were times he would ask me, 'did you work through dinner?' 'Yes, we had working dinners.'"). Sometimes, Ms. Abou-el-Seoud made reservations for these dinners. Pl. Mot. Ex. 14 (11/6/13 email message stating: "Okay, dinner reservations are made at McCormick and Schmick's per . . . my request. Hope that works out for you guys. Reservations are at 645.") But, Ms. Abou-el-Seoud also declined to attend some of these dinners. Pl. Mot. Ex. 25 (10/24/12 email message from Ms. Abou-el-Seoud stating: "BTW – tomorrow I'm having dinner with cousins, was going to tell you today but we've been on different schedules."); Gov't App. at A93 (11/5/13 email response from Ms. Abou-el-Seoud to the CRST Leader regarding dinner, stating: "I think I might pass too."). And, her co-workers characterized these dinners as optional. Gov't App. at A54 (4/7/17 co-worker B testifying that: "[N]obody had to go to dinner. You could have [gone] to dinner on your own. It was a choice."). On other occasions, Ms. Abou-el-Seoud was not invited to these dinners. Pl. Mot. Ex. 13 (5/18/14 email message sent at 5:42 p.m. from CRST Leader to CRST members, other than Ms. Abou-el-Seoud, stating: "1830 lobby for din din? Interested?").

During her employment with the Army Corps, Ms. Abou-el-Seoud also attended conferences that began around 8:00 a.m. and would continue until 5:00 or 6:00 p.m., after which the attendees would go to dinner together. Pl. Mot. Exs. 12 at 25 (4/7/17 co-worker B testifying that "[c]onferences usually start around 8:00 and they would run until about 5:00, 6:00[, but i]t all depended on whether or not you stayed for all the sessions" and "[a] lot of time we would go to dinner together. It was a choice. We could go to dinner or go on your own."), 3 at 60 (3/29/17 second-line supervisor testifying that conferences "would sometimes go up to 5:00, 5:00 or 6:00 at night")). On occasion, the CRST attendees also would "[hang] around together after work" (Pl. Mot. Ex. 1 at 47 (3/29/17 co-worker A testimony)), or participate in "hotwashes."[16] Pl. Mot. Ex. 12 at 40 (4/7/17 co-worker B testifying that "hotwashes" could occur "during the conference, at the end of the conference[, or i]t could be after we got back to the office that we would sit down and have them. It all depends.").

Ms. Abou-el-Seoud was issued a laptop and Blackberry device. Pl. Mot. Ex. 1 at 141–42 (3/28/17 co-worker A testimony), 3 at 64–65 (3/29/17 second-line supervisor testimony). Her second-line supervisor testified that Ms. Abou-el-Seoud was expected to use these devices for "pressing work matters." Pl. Mot. Ex. 3 at 65. Her co-worker also testified: "If she had a BlackBerry, she was available seven days a week, 24 hours a day, like the rest of the team." Pl. Mot. Ex. 1 at 142 (3/28/17 co-worker A testimony). But, this co-worker clarified that, while Ms. Abou-el-Seoud could use her laptop to be available at all hours, he was not sure whether she did, because employees "would get emails from [the CRST Leader] any time he felt like sending one,

---

[16] A "hotwash" was described as a team meeting convened as "[a]n after action review, after you went to a conference all day, you go back and review things that happened to see what was pertinent or relevant or not and apply it if you needed to." Pl. Mot. Ex. 12 at 40 (4/7/17 co-worker B testimony).

BlackBerry, computer, whatever, [but his personal practice was to] get to it whenever [he] turned it on or got around to it."  Gov't App. at A36–37 (3/28/17 co-worker A testimony).

During her employment with the Army Corps, Ms. Abou-el-Seoud also sent a number of messages from her Army Corps email address that were time-stamped after 3:30 p.m.  For example:

- On August 15, 2011 at 4:14 p.m., Ms. Abou-el-Seoud sent an email message stating: "Here is the final [c]hart[.] . . . I'm out of here for the day but have sent it to myself in case you need any more corrections made.  I have my blackberry . . . as well and can make any additional changes."  Pl. Mot. Ex. 16.

- On April 26, 2012 at 5:36 p.m., Ms. Abou-el-Seoud sent an email message and attachment stating: "Sorry for the late response.  Been working on it and wanted to make sure I had things ready for review."  Pl. Mot. Ex. 33.

- On May 8, 2012 at 4:14 p.m., Ms. Abou-el-Seoud sent an email message stating: "Edited Paper[.]  I stripped a few parts, added a few others. . . . I'll work on formatting and final grammar on the next revision after your comments."  Pl. Mot. Ex. 34.

- On July 19, 2012, Ms. Abou-el-Seoud sent a series of email messages to her sister:

  - at 2:45 p.m.[17]: "345 here.  [N]o sign of leaving soon."
  - at 3:11 p.m.: "Yeah.  I'm ready to go."
  - at 3:13 p.m.: "Well . . . I just want to get back to my hotel and sleep.  I have to be in the cab by 415 am tomorrow[.]"
  - at 3:15 p.m.: "I was thinking about even getting up at 3 and working out. [I]f I can be asleep by 10, that's a solid 5 hrs."
  - at 3:16 p.m.: "I probably won't work out tomorrow at all.  Saturday I will when I'm with you.  Then Sunday I will."
  - at 3:49 p.m.: "You there?"
  - at 4:11 p.m.: "I'm still here . . . 510 . . . not leaving soon.  [T]he kano tipota . . . palli . . hahha thiavaso yahoo stories."
  - at 4:13 p.m.: "I'm going to get lettuce wraps at this fancy stupid restaurant we are going to.  I have to set up a meeting to come to DC for a day.  Fly out in the morning, leave that evening."
  - at 4:18 p.m.: "Baller.  That's me.  [I]t's just how I roll.  Haters."

  Pl. Mot. Ex. 45.

---

[17] This email message was time-stamped 2:45 p.m., but the reference within the message to a specific time, *i.e.*, "345 here," differs from the time stamp by one hour.  Likewise, the email message, stating "I'm still here . . . 510 . . . not leaving soon." is time-stamped 4:11 p.m.  Therefore, it appears Ms. Abou-el-Seoud may have been in a different time zone from her sister, or from the location of the database or server from which the email messages were obtained during discovery.

- At 5:22 p.m., Ms. Abou-el-Seoud sent an email message to the CRST Leader with two confirmation numbers, stating: "For spreadsheet before you send it out[.]"  Pl. Mot. Ex. 35.

- At 5:24 p.m., she forwarded a Yahoo news story by email to her sister.  Pl. Mot. Ex. 45.

- At 5:27 p.m., Ms. Abou-el-Seoud emailed a spreadsheet entitled "2012 Room Resrv List update.xls" to the CRST Leader.  Pl. Mot. Ex. 36.

- Beginning at 6:02 p.m., she sent another series of emails to her sister:

  o "All I said [was] that it was said.  I cannot get in trouble for defending our constitution.  It's what the DoD is built off."
  o at 6:04 p.m.: "I work for the United States Department of Defense.  I serve my nation with honor.  I respect all.  That's right.  I'm not afraid to say it."
  o at 6:06 p.m.: "Stop saying okay!  It's annoying!"
  o at 6:08 p.m., she sent another email to her sister, in a foreign language.
  o at 6:10 p.m., she sent another email to her sister.
  o at 6:12 p.m.: "Nope, can't.  [W]e're going to Clyde's."
  o at 6:16 p.m.: "I don't think it's the same [Clyde's]. . . . I love the one in Georgetown. . . . Thank you . . . for that great birthday.  I'll never forget it."
  o at 6:17 p.m.: "[I] have to tell you something[.]"
  o at 6:24 p.m.: "I hate salad with salad.  I really really hate it. . . . I hate the pointless texture, the pointless lack of taste and the pathetic look of it.  I can't wait to [eat a] chili cheese dog and hamburger[.] . . . Hey, you got any good Mexican restaurants by you?"
  o at 6:25 p.m.: "Lets [sic] go there!"
  o at 6:30 p.m.: "Omg . . . [I'm] still here.  630 and I'm still here.  I'm going to cry.  I swear he's doing this on purpose."

  Pl. Mot. Ex. 45.

- On September 24, 2012 at 5:14 p.m., the CRST Leader sent an email message to Ms. Abou-el-Seoud with a document and said, "Nadia – hang this on the internal side for now till we go final[.]"  Pl. Mot. Ex. 28.

  o At 7:32 p.m., she responded, "Roger."  Pl. Mot. Ex. 28.

- On October 24, 2012 at 5:25 p.m., Ms. Abou-el-Seoud sent an email message to the CRST Leader regarding a dinner location.  Pl. Mot. Ex. 25.  At 5:27 p.m., she sent another email message stating: "Meet downstairs in 20?"  Pl. Mot. Ex. 25.

- On November 26, 2012 at 10:03 p.m., Ms. Abou-el-Seoud sent an email message to the CRST Leader stating:

  > Haha thank goodness you made the edits!  I'm sure [our co-worker] will love them . . . but he believes most things I say anyways because he knows I'm the mini boss (don't tell him I said that.  The key to having control is making the other person think they have it!) Haha.

  > Should I get my flights/ request for orders started this week[?]

  Pl. Mot. Ex. 20.

- On December 18, 2012 at 11:59 p.m., Ms. Abou-el-Seoud sent a photograph to her co-worker.  Pl. Mot. Ex. 40.

- On December 19, 2012 at 12:13 a.m., she sent an email message to the same person, stating: "Haha yes I'm with [the CRST Leader]!"  Pl. Mot. Ex. 40.

- On February 15, 2013 at 4:08 p.m., Ms. Abou-el-Seoud sent an email message to the CRST Leader with a newsletter attached, stating: "Final Product!  Need to make distribution list next week!"  Pl. Mot. Ex. 42.

- On February 26, 2013, Ms. Abou-el-Seoud exchanged a series of email messages with her third-line supervisor:

  - at 4:26 p.m., her third-line supervisor sent her an email message requesting that she review some resumes.
  - at 5:49 p.m., Ms. Abou-el-Seoud sent herself an email message entitled "Resume."
  - at 5:54 p.m., Ms. Abou-el-Seoud sent her third-line supervisor an email stating: "I've looked at the resumes . . . [and have] changed a few things . . . .  You might need to open it on a laptop to see the comments since it's not a [Microsoft W]ord document and I just inserted comments into the PDF.  Let me know what you think."
  - at 6:28 p.m., she sent another email message to her third-line supervisor stating: "I'll look at them tonight!"
  - at 8:04 p.m., she sent another email message to her third-line supervisor stating: "I'll convert/redo in [Microsoft W]ord.  Have it to you in less than 1 hour."

  Pl. Mot. Exs. 22, 24.

- On March 5, 2013 at 7:08 p.m., Ms. Abou-el-Seoud sent an email message to several members of the CRST stating: "Figured this one would need a lot of work since it's headed toward the spotlight.  Just thought it would be better to get a draft out for everyone to see so we can start tearing it apart and putting it back together." Pl. Mot. Ex. 23.

- On May 15, 2013 at 4:04 p.m., Ms. Abou-el-Seoud sent an email message to the CRST Leader stating: "Please see attached May Newsletter."  Pl. Mot. Ex. 39.

- On November 20, 2013 at 4:42 p.m., Ms. Abou-el-Seoud sent an email message to three co-workers stating:

> Last night we went to dinner ([two co-workers] and I) and it was not bad.  She's actually been really great this trip . . . we got back to the hotel for a "hotwash" around 9:30 and were stuck working until 12 . . . from now on I'm legitimately claiming overtime since I was not allowed to leave, even after [she] made me explain to [another co-worker] that she [has] low self esteem . . . that was around 11:50.

> \*      \*      \*

> Btw- still at work . . . no sign of leaving . . . and still have another "hotwash" tonight.

Pl. Mot. Ex. 15.

- On November 21, 2013 at 1:28 a.m., Ms. Abou-el-Seoud sent an email message to a co-worker stating: "He just screamed at me in front of the entire restaurant and in front of [another co-worker].  The topic was actually you.  Haha.  I'm so over this." Gov't App. at A88.

- On March 25, 2014 at 9:44 p.m., Ms. Abou-el-Seoud sent an email message from her Blackberry device that forwarded a document from the CRST Leader to another member of the CRST, without content.  Pl. Mot. Ex. 21.

- On May 21, 2014 at 9:27 p.m., Ms. Abou-el-Seoud sent an email message to several members of the CRST stating: "Sorry for the day [sic], but as promised, the attached documents are from my presentations today.  Hopefully they can assist with the homework assignments for tomorrow."  Pl. Mot. Ex. 19.

- On June 13, 2014, at 3:46 p.m., Ms. Abou-el-Seoud sent an email message to several members of the CRST stating: "All, Attached are the Final PowerPoints from the CRST Command Mission Review and Annual CRST Offsite."  Pl. Mot. Ex. 41.

Aside from these email messages, Ms. Abou-el-Seoud also may have worked on assignments when she was on vacation.  For example, her mother testified that they saw Ms. Abou-el-Seoud working in February 2014, while she visited Greece on vacation.  Compl. ¶ 90; Gov't App. at A64–66; Pl. Mot. Ex. 7 at 20 (3/8/17 Pl. mother testifying: "[S]he kept saying, 'I have work to do.' . . . She went on the computer a couple of times. That's all I remember. . . . She says, 'Mom, I have to do this.'").  Her first-line supervisor testified, however, that, at that time, "[w]e were hoping to nominate an employee for . . . [an] award, and [Ms. Abou-el-Seoud] wanted to voluntarily participate in that and help author it because she was a good writer.  So she said she

would work on that on the plane voluntarily to help.  It was not a work assignment."  Gov't App. at A64–65.

In late June and early July 2014, Ms. Abou-el-Seoud visited Paris, France.  Compl. ¶ 93; Pl. Mot. Ex. 9 (time and attendance records showing "Annual Leave").  But, on July 2, 2014, she sent an email message providing travel confirmation numbers for a "Denver Budget Summit" and stated that she would "take care of [a problem] when [she got] back from leave."  Pl. Mot. Ex. 31. Ms. Abou-el-Seoud's sister testified that "[Ms. Abou-el-Seoud] brought her work computer" on the trip and "would be working on reports for extended periods of time.  Same thing where we would have to come back and check [emails] [a] couple hours into our days so that she wouldn't get in trouble."  Pl. Mot. Ex. 44 at 15–16.  After returning from the Paris trip on July 6, 2014, Ms. Abou-el-Seoud requested permission to telework the following day, stating: "I have my laptop and everything here with me since I brought it to Paris to work on some things and will be sending updates if authorized.  Please let me know if that is okay with you."  Pl. Mot. Ex. 18 (7/6/14 email message).

In sum, Ms. Abou-el-Seoud's time and attendance records demonstrate that she requested and received overtime or compensatory time on several occasions.  Pl. Mot. Ex. 9; Gov't App. at A102–10.[18]  Other than her time and attendance records, Ms. Abou-el-Seoud, however, did not keep a record, journal, or other log of hours that she worked in excess of forty per week, but testified in a deposition that there were certain periods where she worked long hours, without requesting overtime.  Gov't App. at A20, A22–26.  Ms. Abou-el-Seoud's first-line supervisor testified in his deposition that he "never specifically required anybody to take comp[ensatory] time if they wanted overtime."  Gov't App. at A61 (3/20/17 first-line supervisor testimony).  He also testified that he "never denied a request" or "disapproved a request" for overtime, nor did he "rip[] up" Ms. Abou-el-Seoud's overtime requests, as she contended.  Gov't App. at A62–63, 67.  Ms. Abou-el-Seoud's second-line supervisor also testified, by deposition: "I don't believe [her] requests were ever denied or disapproved."  Gov't App. at A86 (3/29/17 second-line supervisor testimony).

## II.    PROCEDURAL HISTORY.

On October 26, 2015, Ms. Abou-el-Seoud ("Plaintiff") filed a Complaint in the United States Court of Federal Claims alleging that the Army Corps: (1) improperly classified her GS-11 Technical Writer position, as exempt from the FLSA; (2) failed to pay overtime pay, as required by the FLSA, 29 U.S.C. § 207 (2012); and (3) willfully violated the FLSA's overtime requirements.  ECF No. 1.

On December 3, 2015, the Government filed an unopposed Motion For Extension Of Time to file an Answer to Plaintiff's October 26, 2015 Complaint, that the court granted on December

---

[18] For example, from November 19 to 20, 2013, Ms. Abou-el-Seoud requested and received six hours of overtime.  Pl. Mot. Ex. 9; Gov't App. at A102.  In addition, during the weekend of May 17–18, 2014, Ms. Abou-el-Seoud spent approximately 10 hours working on a project, for which she requested and received compensatory time.  Pl. Mot. Ex. 9; Gov't App. at A108.

7, 2015.   ECF No. 5.   On February 23, 2016, the Government filed an Answer to Plaintiff's October 26, 2015 Complaint.  ECF No. 6.

On April 15, 2016, the parties filed a Joint Preliminary Status Report ("JPSR").  ECF No. 8.  On April 22, 2016, and May 18, 2016, the court convened telephone status conferences.

On May 18, 2016, the court issued a Scheduling Order establishing discovery deadlines and a deadline for any dispositive motions.  ECF No. 9.

On November 3, 2016, the Government filed a Joint Motion To Amend Schedule (ECF No. 10), that the court granted on November 14, 2016.  ECF No. 11.

On January 19, 2017, Plaintiff filed a Motion To Compel Witnesses To Testify At Depositions Via Remote Means.  ECF No. 12.  On February 6, 2017, the Government filed a Response.  ECF No. 13.  On February 13, 2017, the court issued a Memorandum Opinion And Order granting Plaintiff's January 19, 2017 Motion To Compel.  ECF No. 14.

On February 21, 2017, Plaintiff filed a second Joint Motion To Amend Schedule (ECF No. 15), that the court granted on February 23, 2017 (ECF No. 16).  On March 17, 2017, Plaintiff filed a third Joint Motion To Amend Schedule (ECF No. 17), that the court granted on March 21, 2017 (ECF No. 18).

On June 30, 2017, Plaintiff filed a Motion For Partial Summary Judgment ("Pl. Mot."), together with 45 exhibits ("Pl. Mot. Exs. 1–45").  ECF No. 19.  On July 10, 2017, Plaintiff filed a Notice stating that the June 30, 2017 Motion For Partial Summary Judgment inadvertently omitted portions of Exhibit 11, together with Errata Exhibit 11 ("Pl. Mot. Supp. Ex. 11").  ECF No. 20.

On July 13, 2017, the Government filed a Joint Motion To Amend Schedule (ECF No. 21), that the court granted that same day (ECF No. 22).

On October 6, 2017, the Government filed a Response to Plaintiff's June 30, 2017 Motion For Partial Summary Judgement ("Gov't Resp.").  ECF No. 25.

On November 1, 2017, Plaintiff filed a second Joint Motion To Amend Schedule (ECF No. 26), that the court denied as moot. On November 6, 2017, Plaintiff filed a Reply to the Government's October 6, 2017 Response ("Pl. Reply"), together with two exhibits ("Pl. Reply Exs. 1–2").  ECF No. 27.

On February 22, 2018, the court issued an Order directing Plaintiff to file a signed copy of Exhibit 17 to Plaintiff's June 30, 2017 Motion For Partial Summary Judgment.  ECF No. 28.  On that same day, Plaintiff filed a signed copy of that exhibit ("Pl. Mot. Supp. Ex. 17").  ECF No. 29.

## III.   DISCUSSION.

### A.   Jurisdiction.

#### 1.   Governing Precedent.

The United States Court of Federal Claims has jurisdiction under the Tucker Act, 28 U.S.C. § 1491, to adjudicate "any claim against the United States founded either upon the Constitution, or *any Act of Congress or any regulation of an executive department*, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2012) (emphasis added). The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. . . . [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976).

To pursue a substantive right under the Tucker Act, a plaintiff must identify and plead an independent contractual relationship, Constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages. *See Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States, separate from the Tucker Act[.]"). Specifically, a plaintiff must demonstrate that the source of substantive law upon which he relies "can fairly be interpreted as mandating compensation by the Federal Government." *United States v. Mitchell*, 463 U.S. 206, 216–17 (1983) (quotation omitted). Plaintiff must also make "a nonfrivolous allegation that [he] is within the class of plaintiffs entitled to recover under the money-mandating source." *Jan's Helicopter Serv., Inc. v. F.A.A.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008).

The FLSA is a money-mandating source for the purposes of Tucker Act jurisdiction. *See Abbey v. United States*, 745 F.3d 1363, 1369 (Fed. Cir. 2014) ("As the courts have held . . . for three decades, since soon after the FLSA was extended to the federal government [in 1974], the Tucker Act applies to a claim against the government under the monetary-damages provision of the FLSA[.]" (citations omitted)). Because Plaintiff claims that she is entitled to overtime compensation that was willfully withheld, in violation of the FLSA, the court has determined that it has jurisdiction to adjudicate the claims alleged in the October 26, 2015 Complaint for overtime compensation.

#### 2.   Statute Of Limitations.

##### a.   The Government's Argument.

The Government asserted as an affirmative defense that a portion of Plaintiff's claims were time-barred. Gov't Ans. ¶¶ 155–56. Therefore, the Government argues that a two-year statute of limitations applies, because Plaintiff cannot establish that the Army Corps willfully violated the FLSA. Gov't Resp. at 10 (citing 29 U.S.C. § 255(a)[19]). Although Plaintiff argues that her

---

[19] The FLSA does not include a specific statute of limitations. But, the Portal-to-Portal Act of 1947, that amended the FLSA, provides that "[a]ny action commenced . . . for . . . unpaid

supervisors personally observed her working overtime, no evidence was proffered to support these bare assertions. Gov't Resp. at 10. To the contrary, Plaintiff's pay and attendance records demonstrate that she requested and received sixteen hours of overtime pay during the period in question.[20] Gov't Resp. at 10–11. Plaintiff knew the procedure for requesting overtime and followed it. Gov't App. at A27–29. In addition, Plaintiff's first-line supervisor testified in his deposition that he "never denied a request" or "disapproved a request" for overtime. Gov't App. at A62–63. In addition, the deposition transcripts of Plaintiff's other supervisors and co-workers is devoid of testimony that they observed Plaintiff working overtime, and she did not keep a record of the hours of overtime for which she now asserts that she worked. Gov't Resp. at 11–12. Therefore, Plaintiff failed to demonstrate that she worked overtime and the Army Corps refused to pay her, in willful violation of the FLSA. Gov't Resp. at 12. Since Plaintiff has not demonstrated a willful violation, the two-year statute of limitations under 29 U.S.C. § 255(a) applies. Gov't Resp. at 12.

### b.    Plaintiff's Response.

Plaintiff responds that the undisputed evidence shows the three-year statute of limitations applies, because the Government willfully violated the FLSA in failing to compensate her for the overtime hours she worked. 29 U.S.C. § 255(a). Whether an employer committed a willful violation of the FLSA depends on whether the evidence shows that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). To be willful, conduct must be voluntary, deliberate, and intentional, not merely negligent. *Id.* at 134.

Plaintiff argues that her supervisors observed her working after her tour of duty hours and were on notice that she would not be paid for such work, unless she submitted a time card that detailed the overtime hours for management approval. Pl. Mot. at 24 (citing Pl. Mot. Ex. 10 at 29 (RCFC 30(b)(6) deposition of the Army Corps representative testifying that, for disapproved overtime requests, an employee's time card would only show regular time worked); Pl. Mot. Ex. 3 at 89 (3/29/17 second-line supervisor testifying that "it's the policy that overtime shall be approved in advance, and there needs to be a justification for that requested time.")). The Army Corps overtime policy provides that employees who work more than forty hours per week, without obtaining prior approval, must submit timecards that do not include overtime. Pl. Mot. at 24 (citing Pl. Mot. Ex. 10 at 29). Plaintiff's timecards reflect that she generally worked eight hours per day, but even though her supervisors observed that she worked past her tour of duty, her overtime requests were not authorized. Pl. Mot. at 24–25.

---

overtime compensation[] . . . under the [FLSA] . . . may be commenced within two years after the cause of action accrued, . . . except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued[.]" 29 U.S.C. § 255(a).

[20] According to the Government, because the two-year statute of limitations applies and Plaintiff testified, during her deposition, that no claims for overtime were after August 2014, the relevant period for this case is October 26, 2013 to August 15, 2014. Gov't Resp. at 12.

### c.     Plaintiff's Reply.

Plaintiff adds that testimony from a CRST co-worker reflects "[t]he CRST and anybody and everybody associated with us, we all worked a lot.  Some more than 50 to 60 hours a week, specifically [the CRST Leader]" establishes that she, as part of the CRST, also worked more than forty hours per week.  Pl. Reply at 6.

### d.     The Court's Resolution.

Under the Tucker Act, "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereof is filed within six years after such claim first accrues."  28 U.S.C. § 2501.  Although the statute of limitations is considered, in other contexts, an affirmative defense that may be waived, the United States Supreme Court has held that Section 2501 is "jurisdictional," because of the Government's waiver of sovereign immunity.  *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 139 (2008) ("This Court has long interpreted the court of claims limitations statute as . . . 'jurisdictional.'").

Nevertheless, when another statute provides the source of substantive jurisdiction in this court and that provides for a different statute of limitations, the more specific limitations period controls, not the general six-year limitations period in 28 U.S.C. § 2501.  *See Gordon v. United States*, 649 F.2d 837, 844 (Ct. Cl. 1981) (holding that a taxpayer must abide by a shorter statute of limitations in the Internal Revenue Code, rather than the six-year period afforded by the Tucker Act).

The FLSA states that an employee has two years to file a complaint for a violation of the FLSA, unless the employee can establish that the violation was "willful."  *See* 29 U.S.C. § 255(a).  Otherwise, a complaint must be filed within three years after a claim accrues.  *Id.*  The United States Court of Appeals for the Federal Circuit has held that a claim for unpaid overtime "accrues at the end of each pay period when it is not paid."  *Cooke v. United States*, 855 F.2d 848, 851 (Fed. Cir. 1988) (citations omitted).  Our appellate court also has held that the employee has the burden of proof to establish that a FLSA violation was willful.  *See Adams v. United States*, 350 F.3d 1216, 1229 (Fed. Cir. 2003).  To do so, the employee must

> [s]how that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute.  According to the relevant regulations, "[r]eckless disregard of the requirements of the [FLSA] means failure to make adequate inquiry into whether conduct is in compliance with the [FLSA]." 5 C.F.R. § 551.104.  However, a failure to make adequate inquiry . . . must be more than a merely negligent unreasonable failure.

*Abbey v. United States*, 106 Fed. Cl. 254, 282 (Fed. Cl. 2012).

In this case, Plaintiff testified in a deposition that her claims do not extend past August 15, 2014.  Pl. Mot. Ex. 6 at 28.  Because the October 26, 2015 Complaint was filed in the United States Court of Federal Claims on October 26, 2015, the court has determined that it has jurisdiction to adjudicate claims for overtime compensation for the period October 26, 2013 through August 15, 2014.

Plaintiff, however, argues that she is entitled to a three-year statute of limitations, *i.e.*, for additional claims for overtime compensation arising between October 26, 2012 and October 25, 2013, because her supervisors were aware that she was working overtime hours for which she did not receive compensation. Pl. Mot. at 23–25. For the reasons discussed herein, however, Plaintiff failed to meet her burden to establish the absence of a genuine issue of material fact as to whether she was entitled to overtime compensation for the period October 26, 2012 to August 15, 2014. Nor has Plaintiff established that the Army Corps *willfully violated* the FLSA's overtime requirements. *See McClendon v. United States*, 127 Fed. Cl. 654, 659 (Fed. Cl. 2016) ("As the plaintiffs here have not met their burden of proof in establishing that they are entitled to overtime compensation, this [c]ourt shall not evaluate plaintiffs' arguments as to the statute of limitations any further.").

For these reasons, the court has determined that whether it has jurisdiction over claims accruing from October 26, 2012 to October 25, 2013 remains a genuine issue for trial.

## B.      Standing.

"[S]tanding is a threshold jurisdictional issue." *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002). The standing requirements, derived from Article III of the United States Constitution, also apply to the United States Court of Federal Claims. *See Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003) (holding that the United States Court of Federal Claims, "though an Article I court, . . . applies the same standing requirements enforced by other federal courts created under Article III."). Therefore, a plaintiff must establish "an injury-in-fact that is both fairly traceable to the challenged conduct of the defendant and likely redressable by a favorable judicial decision." *Figueroa v. United States*, 466 F.3d 1023, 1029 (Fed. Cir. 2006). In addition, the party invoking jurisdiction bears the burden of establishing constitutional standing. *See Myers Investigative*, 275 F.3d at 1369 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("[T]he party invoking federal jurisdiction bears the burden of establishing [its] elements.")).

In this case, the October 26, 2015 Complaint alleges that Plaintiff worked overtime hours for which the Army Corps did not compensate her, despite the FLSA's requirement that it do so, and requests relief in the form of back pay. Compl. ¶¶ 152–53. Because the October 26, 2015 Complaint alleges an injury-in-fact that is "fairly traceable" to the Army Corps' alleged conduct and that injury can be redressed, if the court determines the Army Corps violated the FLSA, the court has determined that Plaintiff has standing to assert the claims in the October 26, 2015 Complaint.

## C.      Standard Of Review Under RCFC 56.

If there is no genuine issue of material fact, the moving party is entitled to summary judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A material fact is one that might significantly affect the outcome of the suit under applicable law. *Id.* at 247–48 ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. . . . That is, while the materiality determination rests on the substantive law, it is

the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). The existence of "*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* Where the nonmoving party only proffers evidence that is "merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted).

The party moving for summary judgment has the initial burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries its burden to demonstrate an absence of any genuine issue of material fact, then the burden of proof shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. An issue is genuine only if it might prompt a reasonable fact-finder to resolve a factual matter in favor of the nonmoving party. *Id.* at 248. The court is required to resolve any doubts about factual issues in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1987). In doing so, all presumptions and inferences drawn from the evidence must be resolved in favor of the nonmoving party. *Id.*; *see also Turner v. United States*, 901 F.2d 1093, 1095 (Fed. Cir. 1990) ("[In considering a motion for summary judgment,] all justifiable inferences are to be drawn from the underlying facts in favor of the party opposing summary judgment."). When considering a motion for summary judgment, a court does not weigh each side's evidence, *United States v. Diebold*, 369 U.S. 654, 655 (1962), but must view it "through the prism of the substantive evidentiary burden." *Liberty Lobby*, 477 U.S. at 254.

### D.   Plaintiff's Motion For Partial Summary Judgment.

#### 1.   Whether The Government Waived The Affirmative Defense Of Exemption From The Fair Labor Standards Act.

##### a.   Plaintiff's Argument.

Plaintiff argues that she is entitled to partial summary judgment, because the Government failed to assert that she was exempt from the FLSA, as an affirmative defense. Pl. Mot. at 19–20 (citing *Astor v. United States*, 79 Fed. Cl. 303, 308 (Fed. Cl. 2007) ("[T]he [c]ourt may grant summary judgment for Plaintiffs[,] unless [the d]efendant presents evidence creating a genuine issue of material fact on whether Plaintiffs meet one element of the exemption criteria.")).

##### b.   The Government's Response.

The Government responds that the failure to plead an exemption from the FLSA in the "unspecified form [Plaintiff] envisions" does not preclude the Government from asserting that defense. Gov't Resp. at 12. Nor has Plaintiff "argued, and cannot demonstrate, that she would suffer any prejudice[,] if this [c]ourt were to evaluate the issue of exemption upon the merits." Gov't Resp. at 14 (emphasis omitted). In fact, during discovery, Plaintiff explored whether her position was exempt under the FLSA:

- March 20, 2017 deposition of first-line supervisor asking: "Do you recall if she was ever classified as exempt?" Gov't App. at A68.

- March 21, 2017 deposition of third-line supervisor asking: "[A]re you familiar with the terms 'exempt' and 'nonexempt' from overtime?" Gov't App. at A51.
- March 27, 2017 deposition of co-worker C asking: "[A]re you familiar with the terms 'exempt' and 'nonexempt' from overtime?" Gov't App. at A70.
- March 28, 2017 deposition of co-worker A asking: "Going back to our discussion of exempt and nonexempt employees, do you think this paragraph . . . is a fair characterization of how exempt employees at the CRST . . . worked their time?" Gov't App. at A43.
- March 29, 2017 deposition of second-line supervisor asking: "[A]re you familiar with the terms 'exempt' and 'nonexempt' from overtime?" Gov't App. at A85.
- April 5, 2017 RCFC 30(b)(6) deposition asking: "[H]ow is it determined if an employee is exempt or non-exempt?" Gov't App. at A79.
- Document requests for "all documents referencing Plaintiff's work assignments during the covered time period," "[p]osition descriptions of all jobs and/or positions Plaintiff held during the covered time period," and "Plaintiff's complete personnel file." Gov't App. at A99.

Plaintiff relies on the same deposition testimony, however, to evidence that her position was improperly classified, as "exempt" from the FLSA. Gov't Resp. at 14 (citing Pl. Mot. at 21). Plaintiff, however, cannot show that she would be prejudiced by the Government specifically claiming an exemption from the FLSA on this record and at this juncture. *See Bull v. United States*, 68 Fed. Cl. 212, 272 n.66 (Fed. Cl. 2005) (determining that the Government did not waive an affirmative defense, where "the plaintiffs offered no evidence of unfairness generally, or that they were unfairly surprised by the defendant's use of this defense"), *aff'd*, 479 F.3d 1365 (Fed. Cir. 2007); *see also Schwind v. EW Assocs., Inc.*, 357 F. Supp. 2d 691, 699 (S.D.N.Y. 2005) (holding that plaintiff must demonstrate prejudice to preclude the late assertion of an affirmative defense).

### c. Plaintiff's Reply.

Plaintiff replies that she would be severely prejudiced, if the court allowed the Army Corps to assert exemption as an affirmative defense, because discovery closed on April 30, 2017, and Plaintiff filed a dispositive motion, based upon the Government's failure to assert this defense. Pl. Reply at 1–2. In addition, Plaintiff contends that she had "no notice of this defense" and therefore did not "devise fact discovery necessary to analyze one's job duties in regard to possible FLSA exemptions." Pl. Reply at 2. Plaintiff's discovery concerned only the Army Corps' overtime policy for exempt and non-exempt employees. Pl. Reply at 2. If the Government previously had raised exemption as an affirmative defense, Plaintiff "would have sought written discovery and deposition testimony that addressed the substantive issue[s] that determine whether an employee is exempt from FLSA protections." Pl. Reply at 3.

### d. The Court's Resolution.

RCFC 8(c) provides that, "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." RCFC 8(c). In *Conley v. Gibson*, 355 U.S. 41 (1957), the United States Supreme Court explained that "simplified 'notice pleading' [under Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 8] is made possible by the liberal opportunity for discovery

and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues." *Id.* at 47.  And, the United States Court of Appeals for the Federal Circuit explained that the purpose of Fed. R. Civ. P. 8(c)[21] "is to give the opposing party notice of the affirmative defense and a chance to respond." *Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 411 F.3d 1369, 1376 (Fed. Cir. 2005); *see also City of Gettysburg, S.D. v. United States*, 64 Fed. Cl. 429, 449 (Fed. Cl. 2005) (explaining that the purpose of RCFC 8(c) is to "guarantee that the opposing party has notice of any additional issue that may be raised at trial so that the party is prepared to properly litigate it[.] . . . Failure to plead an affirmative defense does not automatically extinguish the defense." (citations omitted)).  Therefore, "[f]ailure to raise an affirmative defense by responsive pleading does not always result in waiver." *Ultra-Precision Mfg*, 411 F.3d at 1376.  Instead, the determinative factor is whether there is unfair surprise or prejudice.  *See Cities Serv. Helex, Inc. v. United States*, 543 F.2d 1306, 1313 n.14 (Ct. Cl. 1976) ("[T]he Government does not very explicitly label its theory . . . as an affirmative defense.  However, since the plaintiffs have ably and thoroughly responded to the Government's arguments, showing no prejudice from the injection of the issue at this stage, and all parties have exhaustively treated it, we will consider the defense on the merits.")

Likewise, the United States Court of Federal Claims has determined that an affirmative defense is not waived, where the Government denied an allegation concerning the merits, but failed to identify it as an affirmative defense in the answer.  *See Hauschild v. United States*, 53 Fed. Cl. 134, 140 (Fed. Cl. 2002).  In that case, the "fact that plaintiff was unaware as to whether the Government meritoriously could rely on an affirmative defense [did] not vitiate the conclusion that plaintiff was on notice of the possibility of a defense." *Id.*

In this case, Plaintiff requested information during discovery "to establish how [the Army Corps] tracks time for and compensates its exempt versus non-exempt employees." Pl. Reply at 2–3.  If the Army Corps raised exemption as an affirmative defense, Plaintiff insists she would have "sought written discovery and deposition testimony that addressed the substantive issue[s] that determine whether an employee is exempt from FLSA protections."  Pl. Reply at 3.  Whether an employee is administratively exempt from the FLSA's overtime requirements, however, depends on an employee's job duties, not how an employee's time is recorded.  *See* 5 C.F.R. § 551.206 (providing an employee is administratively exempt where that employee's "*primary duty* is the performance of office or non-manual work directly related to the management of general business operations" and the "*primary duty* includes the exercise of discretion and independent judgment with respect to matters of significance" (emphasis added)).

---

[21] The text of Federal Rule of Civil Procedure 8(c) and the text of RCFC 8(c) are virtually identical.  *Compare* Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including" seventeen specific defenses), *with* RCFC 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including" sixteen of the seventeen defenses identified in Federal Rule 8(c)); *see also* RCFC 8(c) rules committee note to 2008 amendment ("The language of RCFC 8 has been amended to conform to the general restyling of the FRCP.").  As such, federal appellate court decisions concerning Fed. R. Civ. P. 8(c) are relevant to the court's analysis of RCFC 8(c).

In this case, many of the facts alleged in the October 26, 2017 Complaint describe Plaintiff's job duties to support her argument that the Army Corps improperly classified the GS-11 Technical Writer position to which she was assigned as exempt from the FLSA. *See, e.g.*, Compl. ¶¶ 109, 111, 113–14, 118, 122–24, 138, 140, 143–51; *see also* Pl. Mot. Exs. 1 (3/28/17 co-worker A testimony), 4 (3/27/17 co-worker C testimony), 5 (3/21/17 third-line supervisor testimony). And, although the Government did not explicitly identify exemption as an affirmative defense, the Government denied the allegations concerning whether Plaintiff's duties were properly classified, as exempt from the FLSA. *See, e.g.*, Gov't Ans. ¶¶ 109–24, 138–40, 143–52. As such, Plaintiff conducted jurisdictional discovery about her job duties and the extent to which her supervisors and co-workers were aware thereof. Pl. Mot. at 21–22 (discussing Plaintiff's job duties and arguing they were not exempt from the FLSA); *see also* Pl. Reply Exs. 1 ("Interrogatory No. 3. IDENTIFY and DESCRIBE Plaintiff's job duties for each job or position held since May 2011, including the percentages of time Plaintiff spent on each of these duties."), 2 ("Document Request No. 23. Position descriptions of all jobs and/or positions Plaintiff held during the covered time period."). But, none of Plaintiff's arguments are supported by facts that establish that she was surprised or prejudiced by the fact that the Government now asserts that the duties Plaintiff performed for the Army Corps were exempt from the FLSA.

For these reasons, the court has determined that the Government did not waive an affirmative defense that Plaintiff's GS-11 Technical Writer position was exempt from the FLSA's overtime requirements.

## 2. Whether Plaintiff's GS-11 Technical Writer Position Was Exempt From The Fair Labor Standards Act.

### a. Plaintiff's Argument.

Even if the Army Corps did not waive the affirmative defense, Plaintiff's duties establish that she was not exempt from the FLSA as they included: taking notes; organizing travel arrangements for CRST members; drafting fact sheets and newsletters for the CRST communications network; and drafting summary reports about specific combat vehicles. Pl. Mot. at 20–22 (citing Pl. Mot. Exs. 1 at 31–32, 4 at 15–16, 5 at 141).[22] Plaintiff concedes, however, that she had no special training or coursework for any of these duties and was not involved in the decision to develop the communications network. Pl. Mot. at 22. Therefore, "[t]here is no evidence that any of [Plaintiff's] job duties involved the exercise of discretion and independent judgment with respect to matters of significance." Pl. Mot. at 22. Accordingly, Plaintiff is not exempt from the FLSA and entitled to overtime compensation for hours worked in excess of forty hours per week. Pl. Mot. at 22.

---

[22] The June 30, 2017 Motion For Partial Summary Judgment does not state which of these duties was her primary job duty.

**b.** **The Government's Response.**

The Government responds that Plaintiff's primary duty was to draft "highly detailed technical documents," as evidenced by her employment records and descriptions of her job duties:

- Plaintiff's GS-11 Technical Writer PD (Gov't App. at A3–4);
- Plaintiff's CV (Gov't App. at A7);
- Plaintiff's 2013 Performance Evaluation (Gov't App. at A10–11);
- Plaintiff's testimony stating: "I would write reports. They were called support facility annexes. They were reports identifying if a vehicle - - if a new vehicle entering the Army had an impact to the existing construction and infrastructure." Gov't App. at A18.

The Government adds that other courts have held that technical writers are exempt from the FLSA, "where their primary duty of writing technical documents with minimal supervision 'required exercise of discretion and independent judgment.'" Gov't Resp. at 16 (quoting *Renfro v. Indiana Michigan Power Co.*, 497 F.3d 573, 574, 578 (6th Cir. 2007) (holding that technical writers who develop written procedures, without constant supervision or step-by-step assignments, exercise discretion and independent judgment, because two different technical writers could produce substantially different work products performing the same assignment)).

In this case, Plaintiff's employment records definitively show that her primary duty was the "drafting [of] reports on highly technical subjects" and, as in *Renfro*, she exercised discretion and independent judgment in performing those duties. Gov't Resp. at 16–17 (citing Gov't App. at A1–10).

**c.** **Plaintiff's Reply.**

Plaintiff did not reply to the Government's exemption argument.

**d.** **The Court's Resolution.**

    **i.** **The Relevant Statutory And Regulatory Requirements Governing Whether An Employee's Duties Are Subject To The Fair Labor Standards Act Or Exempt.**

The FLSA states that employees, "employed in a bona fide . . . administrative . . . capacity," are exempt from the FLSA's requirement that hours worked, in excess of forty each week, must be compensated a one and a half times an employee's regular rate of pay. *See* 29 U.S.C. § 213(a)(1) (2012). The governing OPM regulations explain that employees are "presumed to be FLSA nonexempt, unless the employing agency correctly determines that the employee clearly meets the requirements of one or more of the exemptions [from the FLSA] and such supplemental interpretations or instructions issued by OPM." 5 C.F.R. § 551.202(a). Specifically, a federal employee is exempt from the FLSA,

    whose primary duty is the performance of office or non-manual work directly related to the management or general business operations, as distinguished from production functions of the employer or the employer's customers[,] and whose

primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

5 C.F.R. § 551.206.

The exercise of "discretion and independent judgment"

implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, an employee can exercise discretion and independent judgment even if the employee's decisions or recommendations are reviewed at a higher level. Thus, the term does not require that decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment.

5 C.F.R. § 551.202(c).

OPM also defines "discretion and independent judgment with respect to matters of significance," as "involv[ing] the comparison and evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 5 C.F.R. § 551.206(a). Therefore, whether an employee exercises "discretion and independent judgment with respect to matters of significance" depends on "all the facts involved in the particular employment situation in which the question arises." 5 C.F.R. § 551.206(b). In making that determination, the court may consider the following factors, *i.e.*, whether an employee:

(1) Has authority to formulate, affect, interpret, or implement management policies or operating practices;
(2) Carries out major assignments in conducting the operations of the organization;
(3) Performs work that affects the organization's operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the organization;
(4) Has authority to commit the employer in matters that have significant financial impact;
(5) Has authority to waive or deviate from established policies and procedures without prior approval;
(6) Has authority to negotiate and bind the organization on significant matters;
(7) Provides consultation or expert advice to management;
(8) Is involved in planning long- or short-term organizational objectives;
(9) Investigates and resolves matters of significance on behalf of management; [or]

(10)   Represents the organization in handling complaints, arbitrating disputes, or resolving grievances.

*Id.*

These factors, however, are to be "narrowly construed to apply only to those employees who are clearly within the terms and spirit of the exemption." *Id.*

Whether an employee's duty is exempt under the FLSA is a question of law; in contrast, the nature of the employee's duties is a question of fact. *See Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986) ("The question of how the [employees] spent their working time . . . is a question of fact.  The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law[.]").  Therefore, to determine whether an employee's duties are exempt from the FLSA, the trial court "must have before it sufficient facts concerning the daily activities of that position to justify its legal conclusion." *Berg v. Newman*, 982 F.2d 500, 503 (Fed. Cir. 1992).

> ii.   **There Are Sufficient Facts Before The Court To Determine Whether Plaintiff Was Exempt From The Fair Labor Standards Act.**

The record before the court contains the following evidence.

Ms. Abou-el-Seoud had several supervisors, but worked primarily with the CRST Leader. Pl. Mot. Ex. 1 at 30 (3/28/17 co-worker A testifying: "Her work assignments came from [the CRST Leader]" but "after he passed away, she took direction from me for just a couple of months, but her supervisors were down at Fort Worth, Texas."), 31 (3/28/17 co-worker A testifying that the CRST Leader had "these little bulletins and things . . . and [Ms. Abou-el-Seoud] was asked to kind of make them formal and pretty them up and that kind of stuff, but she didn't get anything that [the CRST Leader] didn't give her, from me anyway").  Several deponents testified that they were not aware of the full breadth of Plaintiff's job duties.  Pl. Mot. Exs. 1 at 73 (3/28/17 co-worker A testimony that, other than travel arrangements and technical reports, he did not know what Plaintiff was working on), 4 at 15–16 (3/27/17 co-worker C testifying that she did not "know the extent of all [Plaintiff's] duties"), 5 at 140 (3/21/17 third-line supervisor testifying that while Plaintiff made travel arrangements and took notes, he did not know how much time she spent on such tasks).  In addition, one of Plaintiff's co-workers testified that she was required to research information about certain combat vehicles to write reports about those vehicles.  Pl. Mot. Ex. 1 at 72 (3/28/17 co-worker A testimony) ("We have these things called support facility annexes so that when a materiel is developed, like a tank or whatever, we have to determine the impact of that new vehicle or whatever on our facilities. . . . [T]he agency that makes that piece of equipment has to get with the [Army Corps] and develop the support facility annex . . . and so she was working on some of those for the team.").

The Government, however, proffers evidence of Plaintiff's primary job duties as follows: (1) Plaintiff's GS-11 Technical Writer PD (Gov't App. at A1–A6); (2) Plaintiff's CV (Gov't App. at A7– A9); (3) Plaintiff's Performance Evaluation for the period November 1, 2012 to March 1, 2013 (Gov't App. at A10–14); (4) Plaintiff's Fiscal Year 2013 performance goals and list of

significant accomplishments (Gov't App. at A15–17); and (5) deposition testimony from various members of the CRST as detailed below.[23]

First, the GS-11 Technical Writer PD describes these duties, as follows:

Serves as a Technical Writer-Editor with responsibility for writing, editing reviewing, and publishing engineering documents.  Publications include a variety of reports, assessments, proposals, memorandum, work plans, reconnaissance and feasibility reports, scopes of work, design documentation reports, environmental assessments and impact statements, general and limited reevaluation reports, fact sheets, operation-and-maintenance manuals, and brochures for proposed, current, and completed projects.  The purpose of the documents is to present and interpret technical data, explain results and procedures, and provide rationale for recommended actions.  The position requires general knowledge such as civil and military engineering, operations, hydrology, geology, environmental sciences, real property acceptance and excess procedures or other complex technical subject matters and an understanding of project-related social, environmental, and economic considerations.  Participation in project-related meetings and conferences and project site visits is required.

Gov't App. at A2.

The PD also lists such other duties as "obtain[ing], analyz[ing], and verify[ing] information" and "research[ing], analyz[ing], and distill[ing] technical data for a variety of technical fields and present[ing] the information in written format as appropriate for the skill level of the intended audience."  Gov't App. at A3.  The PD also describes the Technical Writer position as one: that has "a great deal of independence . . . with minimal supervisory oversight;" where the employee "use[s] judgment to adapt or modify guidelines to fit the task at hand;" and requiring "research, analy[zing], and interpret[ing] . . . information on a variety of subjects."  Gov't App. at A4.

Second, Plaintiff's CV describes her job duties, as "serv[ing] as the Strategic Communications Officer . . . which involves being the communications liaison between the Army Staff and the [Army Corps] . . . regarding research, reports, and communicating mission effectiveness."  Gov't App. at A7.  In this role, Plaintiff was responsible for "generating and reviewing CRST generated documentation, reports, data[,] and sensitive information[.]"  Gov't

---

[23] The Government offers little in the way of argument, other than asserting that Plaintiff's employment records demonstrate her primary duty was to draft detailed technical reports that involve the exercise of discretion and independent judgment.  Gov't Resp. at 15.  Although the court need only consider the cited materials, the court also may consider any other evidence in the record.  *See* RCFC 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").  Accordingly, because the Government asserts that the employment records support its position that Plaintiff is exempt from the FLSA, the court will consider those records, contained in the Government's Appendix, as reliable and probative evidence.

App. at A7.  Plaintiff also reviewed "results of technical reports with Army Staff, [Army Corps] employees . . . and internal and external stakeholders to determine revisions, changes in scope of work, quality assurance, content and methods of reproduction and redistribution."  Gov't App. at A7.  The list of significant accomplishments for the Fiscal Year 2013 timeframe included "research[ing], collect[ing,] and analyz[ing] CRST impacts on . . . [the Army Corps], in addition to analyzing methods to increase CRST awareness throughout federal organizations."  Gov't App. at A17.  In addition, the list includes obtaining data and developing and editing guidance documentation "to reflect CRST's mission objectives, initiatives, and progress and a one-of-a-kind matrix organization operating within the . . . Chief Engineers Office and [Army Corps Headquarters]."  Gov't App. at A17.

Third, Plaintiff's Performance Evaluation for November 1, 2012 to March 1, 2013 described her duties as follows:

> Serve as a staff action officer and Project Manager for Ground Systems, and requirements validation mission areas for the Forward Support Office – Fort Worth . . . CRST[.]  *Under the direction and management* of the CRST Program Manager [Military Construction] Requirements & Standardization Integration (PM MRSI) Suite, conducts comparative analyses, reviews and edits CRST generated documentation, reports, data, or information as directed.

Gov't App. at A10 (emphasis added).

Plaintiff's Performance Evaluation, however, also reflects that Plaintiff was "[a]ble to complete task[s] virtually error-free and with minimal supervision."  Gov't App. at A10.  Plaintiff also was described as having "[c]o-developed Support Facility Annex design for SFA online data entry application."  Gov't App. at A11.  The Performance Evaluation also mentions that Plaintiff's "initiative and dedication[ enabled] the CRST Strategic Communications Plan . . . to shape Army decisions[,]" that Plaintiff "[d]etermined Army material [e]nd-items and determine[d] if impacts are fiscally appropriate for the Army," and that Plaintiff's "contributions to date are considered attributable to the ability to expand the CRST's role in the Army Modernization."  Gov't App. at A11.

Fourth, in a summary of tasks performed during the week of July 14, 2014, Plaintiff reported that she reviewed support facility annexes drafted by a co-worker and began another one that week, as well as completed a knowledge assessment assigned by senior CRST members.  Gov't App. at A94.

For these reasons, the court has determined that the proffered evidence is sufficient to evaluate whether the parties have met their respective burdens of proof on a motion for partial summary judgment.  *See Berg*, 982 F.2d at 503.

### iii.   Plaintiff Failed To Establish That She Is Entitled To Summary Judgment As To The Issue Of Exemption.

The general rule is that the "application of an exemption under the [FLSA] is a matter of affirmative defense on which the employer has the burden of proof."  *Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974).  But, where an employee moves for summary judgment on

the issue of exemption, even if the employee does not have the burden of proof on the issue, "the movant nonetheless bears the initial burden of coming forward with sufficient evidence to demonstrate that there is no material issue of fact that would preclude summary judgment, and that it is entitled to judgment as a matter of law." *Vivid Techs. Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 806 (Fed. Cir. 2009) (discussing the plaintiff's burden of proof on a summary judgment motion).  If the moving party meets this initial burden, the nonmoving party "does not, at this stage, have the burden of establishing that it is entitled to judgment in its favor." *Id.* at 806–07.  Instead, "it need only show either that the movant did not establish that it is entitled to judgment on the undisputed facts or on the opposer's version of facts, or that there are material issues of fact which require resolution at trial." *Id.* at 807.  Accordingly, the court first examines whether Plaintiff's evidence demonstrates that there is no material issue of fact that would preclude summary judgment in her favor.

Plaintiff's evidence supports the finding that she performed "office or non-manual work directly related to the management or general business operations, as distinguished from production functions" (5 C.F.R. § 551.206), but does not clearly fall within the factors to be considered in determining whether her duties were exempt from the FLSA.  5 C.F.R. § 551.206(b).  For example, making travel arrangements, taking notes, and drafting "fact sheets and newsletters" appear to be administrative duties rather than "matters of significance."  5 C.F.R. § 551.206.  Co-worker and supervisor testimony reflected that they generally did not know what Plaintiff did, other than taking notes, making travel arrangements, and writing technical reports.  Pl. Mot. Exs. 1 at 73 (3/28/17 co-worker A testimony), 5 at 140 (3/21/17 third-line supervisor testimony).  And, co-worker testimony reflected that she received a number of assignments directly from and provided support to the CRST Leader.  Pl. Mot. Ex. 1 at 31–32 (3/28/17 co-worker A testifying that "[Plaintiff] didn't get anything that he didn't give her, from me anyway").  This suggests that Plaintiff performed primarily administrative support tasks for the CRST Leader, and did not have the discretion and independent judgment as to "matters of significance" required for her position to be considered exempt from the FLSA.  *See* 5 C.F.R. § 551.206.  For these reasons, the court has determined that Plaintiff has met her initial burden of proof to present sufficient evidence to demonstrate that there is no material issue of fact that would preclude summary judgment and she is entitled to judgment, as a matter of law, on the issue of exemption.  *See Vivid Techs.*, 200 F.3d at 806 ("[T]he movant . . . bears the initial burden of coming forward with sufficient evidence to demonstrate that there is no material issue of fact that would preclude summary judgment, and that it is entitled to judgment as a matter of law.").

But, the burden of proof next shifts to the Government, as the nonmoving party, to present evidence to rebut that offered by Plaintiff.  Here, the court must consider evidence in the context of the applicable evidentiary burden.  *See Liberty Lobby*, 477 U.S. at 254 (holding the court must view such evidence "through the prism of the substantive evidentiary burden").

Neither the United States Supreme Court nor the United States Court of Appeals for the Federal Circuit has discussed the relevant evidentiary standard to be applied in determining whether an employee is exempt from the FLSA.  The presumption in civil cases, however, is that the burden of proof to establish an element of a claim or an affirmative defense is met by a preponderance of the evidence.  *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 388–89 (1983) ("Where . . . proof is offered in a civil action, as here, a preponderance of the evidence will establish the case[.]"); 2 CHARLES MCCORMICK, MCCORMICK ON EVIDENCE § 339 (Kenneth S.

Broun, ed., 7th ed. 2016) ("According to the customary formulas a party who has the burden of persuasion of a fact must prove it . . . in civil cases 'by a preponderance of evidence.'").  The majority of federal appellate courts[24] also have held the preponderance of the evidence standard should apply in determining whether an employer has met the burden to establish that an employee is exempt from the FLSA or not.  *See, e.g.*, *Meza v. Intelligent Mexican Mktg., Inc.*, 720 F.3d 577, 581 (5th Cir. 2013) (holding the "preponderance of the evidence" standard applies in establishing an FLSA exemption); *Lederman v. Frontier Fire Protection, Inc.*, 685 F.3d 1151, 1157–58 (10th Cir. 2012) ("[O]ur cases stand for the proposition that in considering an FLSA exemption, a court must find that the claimed exemption falls 'plainly and unmistakably' within the terms of the statute—not for the proposition that an employer need prove such an exemption by anything more than a preponderance of the evidence."); *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501–02 (6th Cir. 2007) (rejecting the "clear and affirmative evidence" in favor of a "preponderance of the evidence" to establish an FLSA exemption); *Yi v. Sterling Collision Ctrs., Inc.*, 480 F.3d 505, 507–08 (7th Cir. 2007) (rejecting the "clear and affirmative evidence" standard and holding that, to establish an FLSA exemption, an employer must meet the burden of proof by a "preponderance of the evidence," because there was no indication Congress intended a higher standard to apply); *Dybach v. Florida Dep't of Corr.*, 942 F.2d 1562, 1566 n.5 (11th Cir. 1991) (observing the "preponderance of the evidence" standard applies in establishing an FLSA exemption); *Norman v. Moseley*, 313 F.2d 544, 546 (8th Cir. 1963) (affirming the trial court's application of the "preponderance of the evidence" standard to establish an FLSA exemption); *Tel. Answering Serv., Inc. v. Goldberg*, 290 F.2d 529, 533–34 (1st Cir. 1961) (same); *Coast Van Lines v. Armstrong*, 167 F.2d 705, 707 (9th Cir. 1948) (same).  *But see Desmond v. PNGI Charles Town Gaming, L.L.C.*, 564 F.3d 688, 692 n.3 (4th Cir. 2009) (applying the "clear and convincing evidence" standard to establish an FLSA exemption).

On two occasions, the United States Court of Federal Claims has relied on *Berg v. United States*, 982 F.2d 500 (Fed. Cir. 1992), to determine that an employer must establish that an employee is exempt from the FLSA, by "clear and convincing evidence."  *See King v. United States*, 119 Fed. Cl. 277, 283 (Fed. Cl. 2014); *see also Astor v. United States*, 79 Fed. Cl. at 305.  But, it is not clear that *Berg* requires the "clear and convincing evidence" standard, because in that

---

[24] Each of the appellate cases cited herein discuss the burden of proof required to satisfy exemption criteria promulgated under the United States Department of Labor's ("DOL") FLSA implementing regulations.  The FLSA is administered by the DOL as to private employers, but by the OPM as to federal employers.  *See* 5 C.F.R. § 551.101(c) ("OPM's administration of the [FLSA] must comply with the terms of the [FLSA,] but the law does not require OPM's regulations to mirror the [DOL's] FLSA regulations.  OPM's administration of the [FLSA] must be consistent with the [DOL's] administration of the [FLSA,] only to the extent practicable and only to the extent that this consistency is required to maintain compliance with the terms of the Act. For example, while OPM's executive, administrative, and professional exemption criteria are consistent with the [DOL's] exemption criteria, OPM does not apply the highly compensated employee criteria in 29 C.F.R. 541.601 to determine FLSA exemption status.").  Under both DOL and OPM regulations, however, the employer has the burden of proof to establish an exemption, regardless of whether that employer is public or private. 5 C.F.R. § 551.202(c); *see also Corning Glass Works*, 417 U.S. at 196 ("[A]pplication of an exemption under the [FLSA] is a matter of affirmative defense on which the employer has the burden of proof.").

case there was no evidence of any specific required job duties and the two conclusory statements proffered by the Government that the relevant employee correctly was classified as exempt did not satisfy the Government's burden of proof. *See Berg*, 982 F.2d at 503 ("The record provides little, if any, evidence of appellants' supervisory or managerial functions on a daily basis. Nor does the record show that appellants' duties require frequent exercise of discretion and independent judgment.").

The applicable OPM regulations also do not provide more specific guidance other than that FLSA exemptions are to be construed narrowly. *See* 5 C.F.R. § 551.202(c); *cf. A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) ("To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretive process and to frustrate the announced will of the people."). Therefore, an employee who "clearly meets the criteria for exemption must be designated FLSA exempt. If there is a *reasonable doubt* as to whether an employee meets the criteria for exemption, the employee should be designated FLSA nonexempt." 5 C.F.R. § 551.202(d) (emphasis added).

In this case, the evidence supports a finding that Plaintiff performed some administrative support tasks, such as making travel arrangements for CRST employees and taking notes during various meetings. Pl. Mot. Exs. 1 at 72–73, 5 at 140. In sum, however, the Government's evidence supports the inference that Plaintiff primarily was responsible for drafting, revising, and producing various written reports and guidance documents that analyzed the impact of certain end-items on Army capabilities. Gov't App. at A1–17. For example, the written reports produced as part of Plaintiff's primary duty analyzed the impact that various materiel systems and vehicles would have on Army resources, and made recommendations regarding whether such items were "fiscally appropriate." Gov't App. at A11. In addition, Plaintiff's PD and performance evaluation evidence that Plaintiff was expected to work independently, and she did so. Plaintiff's PD described the Technical Writer position as one that has "a great deal of independence . . . with minimal supervisory oversight," and that requires the employee to "use judgment to adapt or modify guidelines to fit the task at hand" and to "research, analyz[e], and interpret[] . . . information on a variety of subjects." Gov't App. at A4. Despite this evidence, Plaintiff insists that these duties simply were "research[ing], collect[ing,] and analyz[ing] CRST impacts on . . . [the Army Corps]." Gov't App. at A17 (List of Significant Accomplishments).

As the implementing regulations provide, Plaintiff was not required to perform work that was entirely free of upper-level review; but, the drafting of the technical reports and comparative analysis entailed some degree of discretion. 5 C.F.R. § 551.206(b) (defining "discretion and independent judgment with respect to matters of significance" as "involv[ing] the comparison and evaluation of possible course of conduct, and acting or making a decision[25] after the various possibilities have been considered"). Since Plaintiff had no choice about which reports to write, the court reasonably can infer that the "Under the direction and management" portion of Plaintiff's performance evaluation described the systems and vehicles that she analyzed, rather than the content of that analysis. Moreover, the regulations provide that the exercise of "discretion and independent judgment with respect to matters of significance" may be established where an

---

[25] Decisions may "consist of recommendations for action rather than actual taking of action." 5 C.F.R. § 551.206(b).

employee has "authority to waive or deviate from established policies and procedures without prior approval." 5 C.F.R. § 551.206(b). In this case, Plaintiff's PD provides that she was to "use judgment to adapt or modify guidelines to fit the task at hand." Gov't App. at A4.

The applicable OPM regulation also provides that, in determining whether the administrative exemption applies, consideration must be given to whether an employee has "authority to formulate, affect, interpret, or implement management[26] policies or operating practices" and provides "consultation or expert advice to management." 5 C.F.R. § 551.206(b). In this case, Plaintiff's reports were reviewed by the Army to determine whether the vehicles discussed were "fiscally appropriate." Gov't App. at A11. In addition, her technical reports were used by management in decisionmaking.[27]

As such, the evidence proffered by the Government and unrebutted by the Plaintiff, and the reasonable inferences drawn therefrom are sufficient, in light of the preponderance of the evidence standard, to show that Plaintiff's primary duty was to draft important technical reports that entailed the exercise of discretion and independent judgment that would render Plaintiff's position as a GS-11 Technical Writer to be exempt from the FLSA. As the nonmoving party, the Government "does not, at this stage, have the burden of establishing that it is entitled to judgment in its favor." *Vivid Techs.*, 200 F.3d at 806–07. Instead, the Government has met its burden to show that "there are material issues of fact which require resolution at trial." *Id.* at 807.

For these reasons, the court has determined that Plaintiff's Motion For Partial Summary Judgment as to the issue of exemption is denied.

---

[26] "Management" is defined as "determining the type of materials, supplies, machinery, equipment, or tools to be used or merchandise to be bought, stocked and sold." 5 C.F.R. § 551.104.

[27] Plaintiff's first-line supervisor testified that the CRST was responsible for assisting the Army with determining the appropriate facilities for new vehicles and other materiel. Pl. Mot. Supp. Ex. 11. And, her co-worker testified: "We have these things called support facility annexes so that when a materiel is developed, like a tank or whatever, we have to determine the impact of that new vehicle or whatever on our facilities. . . . [T]he agency that makes that piece of equipment has to get with the [Army Corps] and develop the support facility annex . . . and so she was working on some of those for the team." Pl. Mot. Ex. 1 at 72 (3/28/17 co-worker A testimony). Therefore, the record supports the determination that management used the technical reports Plaintiff wrote to make decisions about such facilities, and that Plaintiff "provide[d] consultation or expert advice to management." 5 C.F.R. § 551.206(b).

3.    **Whether Plaintiff Is Entitled To Compensation For Alleged Overtime Hours.[28]**

a.    **Plaintiff's Argument.**

Plaintiff argues that it is undisputed that she worked overtime hours without compensation. Pl. Mot. at 25.

i.    **Fort Worth.**

Plaintiff testified that she routinely worked until 5:30 p.m. or later when she was stationed at the Army Corps' Fort Worth office.  Pl. Mot. Ex. 6 at 28–29.  This was corroborated by her mother's deposition testimony that she picked Plaintiff up after work when visiting Forth Worth, sometimes around 7:30 p.m. and spoke with Plaintiff by telephone after she arrived home from work.  Pl. Mot. Ex. 7 at 12 (3/8/17 Pl. mother testimony).   Plaintiff's sister also testified that Plaintiff was working overtime on a regular basis.  Pl. Mot. Ex. 8 at 13 (3/8/17 sister testifying: "I know that she started indicating that she worked additional hours when she was working in Fort Worth. . . . I don't remember a lot of details.  Just that she, you know – she had to stay late some days in the office.").

ii.    **Lunch Breaks.**

Plaintiff testified that she worked through lunch breaks, both in Fort Worth and in the Washington, D.C. office, when she was on travel.  Pl. Mot. Ex. 6 at 49.  Plaintiff's co-worker testified that "sometimes [Plaintiff] ate at her desk."  Pl. Mot. Ex. 1 at 146 (3/28/17 co-worker A testimony).  Her first-line supervisor could not recall whether Plaintiff took lunch breaks in Fort Worth.  Pl. Mot. Supp. Ex. 11 at 123–24 (3/20/17 first-line supervisor testimony).  Another co-worker could not recall whether Plaintiff took lunch breaks when she was working at the Washington, D.C. office.  Pl. Mot. Ex. 12 at 71 (4/7/17 co-worker B testimony).

iii.    **Dinners And Travel In Washington, D.C.**

Plaintiff testified during her deposition that she would attend dinners with the CRST Leader approximately three times per week, when she was working in Washington, D.C.  Pl. Mot. Ex. 6 at 67–68.  This was corroborated by deposition testimony from her family members.  Pl. Mot. Exs. 8 at 13–14 (3/8/17 Pl. sister testifying that the CRST Leader would "require [Plaintiff] . . . to attend what he called business dinners"), 7 at 26–27 (3/8/17 Pl. mother testifying that Plaintiff was "afraid that she was going to be dismissed from her position," if she did not attend the dinners, because the CRST Leader told her that if she did not attend, he could "cut [her] funding").

---

[28] The Army Corps' overtime policy provides that employees who are exempt from the FLSA are paid "straight time" for overtime hours worked and non-exempt employees are paid "time and a half."  Pl. Mot. Ex. 10 at 16 (4/5/17 RCFC 30(b)(6) deposition).  Plaintiff's status, *i.e.*, exempt or non-exempt from the FLSA, is not dispositive of whether she is entitled to compensation for hours of overtime that she allegedly worked.  Instead, it determines only the amount of compensation, if any, that Plaintiff may receive.

Plaintiff also testified that she attended nightly working dinners when she attended conferences. Pl. Mot. Ex. 6 at 141. On these occasions, Plaintiff and the other attendees would "discuss our tactics for how to implement the information we just learned at the conference and how the [CRST] could utilize that information to create a positive impact to the Army staff" and Plaintiff would advise the team how to write articles or website posts to convey the lessons learned at the conference. Pl. Mot. Ex. 6 at 142. When she discussed the "late hours" with one of her supervisors, they responded "in a very demanding tone" not to "bring it up . . . and that this is what we do." Pl. Mot. Ex. 6 at 82.

In addition, Plaintiff testified that when she was on travel in Washington, D.C., she regularly would have to work overtime hours in the evenings at her hotel. Pl. Mot. Ex. 6 at 158–59. Plaintiff's mother testified that she visited the hotel and "saw her working at night," because "she told us, I have to go downstairs to the lobby to work on a project. And we would walk down and walk out and then come back and she would be sitting there working." Pl. Mot. Ex. 7 at 13 (3/8/17 Pl. mother testimony). Other CRST members testified that, "that was the way [the CRST Leader] worked," because hotel rooms were "private[ with] no noise, [and] had computer access." Pl. Mot. Ex. 1 at 62 (3/28/17 co-worker A testimony). Plaintiff also testified that she was required to work with the CRST Leader over the weekends in Washington, D.C., for approximately eleven hours per day. Pl. Mot. Ex. 6 at 82.

Plaintiff further testified that, when she was on travel in Washington, D.C., the CRST Leader picked her up from her hotel so that he could drive her to work each morning, and would sometimes also drive her back to the hotel in the evenings. Pl. Mot. Ex. 6 at 158–59. This was corroborated by testimony by her mother, sister, and co-workers. Pl. Mot. Exs. 7 at 39 (3/8/17 Pl. mother testimony), 8 at 19–20 (3/8/17 Pl. sister testimony), 12 at 32–33, 71 (4/7/17 co-worker B testimony).

### iv.    Conferences.

Plaintiff testified that she worked overtime hours at various conferences (Pl. Mot. Ex. 6 at 141), because the conferences began around 8:00 a.m. and would continue until 5:00 or 6:00 p.m., after which the attendees would go to dinner together. Pl. Mot. Ex. 12 at 25 (4/7/17 co-worker B testifying that "[c]onferences usually start around 8:00 and they would run until about 5:00, 6:00"); Pl. Mot. Ex. 3 at 60 (3/29/17 second-line supervisor testifying that conferences "would sometimes go up to 5:00, 5:00 or 6:00 at night"). On occasion, CRST attendees also would "[hang] around together after work" (Pl. Mot. Ex. 1 at 47 (3/28/17 co-worker A testimony)), or participate in "hotwashes" at the end of a conference day to "go back and review things that happened to see what was pertinent or relevant or not and apply it if you needed to." Pl. Mot. Ex. 12 at 40 (4/7/17 co-worker B testimony).

### v.    Vacation In France.

Plaintiff worked overtime hours during a vacation in Paris, France, according to family members who also were on vacation with her, who testified that they would have to "go back to the hotel for [Plaintiff] to respond to emails . . . [because s]he would be working on reports for extended periods of time" and they observed that she was working on matters for the Army Corps.

Pl. Mot. Ex. 44 at 15–17 (3/8/17 Pl. sister testimony).  Plaintiff also informed her supervisors after the fact that she had been working in Paris.  Pl. Mot. Ex. 18.

### vi.  Vacation In Greece.

Plaintiff's supervisor was aware she worked overtime hours when she traveled to Greece, even if he was unaware of the exact number of hours she worked.  Pl. Mot. Supp. Ex. 11 at 182–83 (3/20/17 first-line supervisor testifying that Plaintiff "wanted to voluntarily participate in" nominating an employee for an award while she was on the plane to Greece).  This was corroborated by her mother, who observed Plaintiff working during the trip.  Pl. Mot. Ex. 7 at 20–21 (3/8/17 Pl. mother testimony).

### b.  The Government's Response.

The Government responds that much of the witness testimony Plaintiff relies on to support her argument for summary judgment is vague and indeterminate as to time.  Gov't Resp. at 19.  As such, the quality of this evidence does not provide sufficient support to grant summary judgment in Plaintiff's favor.  Gov't Resp. at 19.  In addition, Plaintiff's timecards after October 26, 2013 reflect that for twenty-one of the forty-two weeks at issue, Plaintiff was on some form of compensable leave, other than weekends and holidays.  Gov't Resp. at 20 (citing Pl. Mot. Ex. 9).  This implies that she worked full-time hours for only half of her employment during this period.  Gov't Resp. at 20.  And, even if Plaintiff or other witnesses testified that she regularly worked after 3:30 p.m., that does not establish that Plaintiff was performing work that qualified as compensable overtime.  Gov't Resp. at 20.

The Government adds that the numerous email messages on which Plaintiff relies are insufficient to establish that she worked uncompensated overtime hours.  Gov't Resp. at 42.  Specifically, no justifiable inferences can be drawn regarding: (1) how long Plaintiff spent drafting the email message; (2) when Plaintiff wrote the email message prior to sending it; (3) the amount of time Plaintiff spent on any work assignments referenced in the email message; and (4) whether Plaintiff continuously worked past 3:30 p.m., until the time she sent the email message.  Gov't Resp. at 42.  And, even if the email messages qualify as "work" under the FLSA, they are no more than "de minimis" work, because many of the email messages simply forwarded documents Plaintiff received from her co-workers or provided short comments about where she would be working that week.  *See, e.g.*, Pl. Mot. Exs. 19, 21, 31, 38, 42.  In addition, the email messages do not establish that Plaintiff worked her regularly scheduled workday on those days, particularly because Plaintiff regularly arrived to work *after* 7:00 a.m. and frequently went to the gym around 4:00 p.m.  Gov't Resp. at 43.

### i.  Fort Worth.

The Government argues that Plaintiff did not meet her burden to prove that she worked compensable overtime when she worked in the Fort Worth office.  Gov't Resp. at 21.  Although her regularly scheduled work hours were from 7:00 a.m. to 3:30 p.m., she routinely did not arrive at work until at least 7:30 a.m.  Gov't App. at A21 (3/7/17 Pl. testimony).  Even if Plaintiff's supervisor recalls her in the office after 3:30 p.m., between 2012 and 2014, that does not establish that Plaintiff was working overtime, since her presence did not establish that she arrived to work

at 7:00 a.m. or was performing work, just because she was seen at her cubicle.  Gov't Resp. at 21–22 (citing Gov't App. at A57).  In addition, Plaintiff frequently went to the gym "at night, in the afternoon, 3:30, 4:00 timeframe, and [returned to the office] at night, in the afternoon, and get back sometimes at 5:00, 5:30 in the office."  Gov't App. at A82–83 (3/29/17 second-line supervisor testimony).

### ii.    Lunch Breaks.

The Government does not address Plaintiff's argument regarding her lunch breaks.

### iii.    Dinners And Travel In Washington, D.C.

The Government argues that Plaintiff's evidence also does not support the contention that she was required to attend working dinners.  Gov't Resp. at 23.  As one co-worker testified: "I don't know [if she attended working dinners], because I wasn't watching what she was doing."  Gov't App. at A37 (3/28/17 co-worker A testimony).  And, although another co-worker testified that Plaintiff sometimes went to dinner with the CRST, he also clarified that "nobody had to go to dinner.  You could have [gone] on your own.  It was a choice."  Gov't App. at A54 (4/7/17 co-worker B testimony).  Although Plaintiff's second-line supervisor testified that he attended dinners with the CRST Leader, that did not establish that Plaintiff attended mandatory dinners with the CRST Leader, that such dinners were working dinners, or that they lasted until 9:30 or 10:00 p.m.  Gov't Resp. at 25 (citing Pl. Mot. Ex. 3 at 50–51 (3/29/17 second-line supervisor testimony)).

In addition, email messages that Plaintiff cites as support for the assertion that she attended mandatory working dinners are irrelevant.  Gov't Resp. at 26.  For example, Plaintiff relies on a May 18, 2014 email sent at 5:42 p.m. to three other individuals, with the subject "1830 lobby for din din? Interested?"  Pl. Mot. Ex. 13.  Plaintiff cites this email as support for the proposition that she was required to attend working dinners in Washington, D.C., and that she simultaneously was required to attend dinner during a conference in San Antonio, Texas.  Pl. Mot. ¶¶ 19, 38.  In any event, "whether [the CRST Leader] sent a dinner invitation to [a co-worker] on May 18, 2014 is not material to, and does not substantiate in any way, [Plaintiff's] assertion that she was 'required' to attend 'working' dinners in Washington, D.C., past her[] duty hours."  Gov't Resp. at 26.

As for the November 6, 2013 email message that was sent at 12:52 p.m., reflecting that 6:45 p.m. reservations were made for a dinner, that does not reflect whether the recipients attended the dinner at the proposed date and time.  Gov't Resp. at 26–27 (citing Pl. Mot. Ex. 14).  In any event, as a co-worker testified, dinners were optional.  Gov't App. at A54 (4/7/17 co-worker B testimony).

The email messages sent on November 20 and 21, 2013 also do not support Plaintiff's assertion that she attended mandatory working dinners.  Gov't Resp. at 27.  The first states, "He just screamed at me in front of the entire restaurant and in front of [another co-worker].  The topic was actually you.  Haha.  I'm so over this."  Gov't App. at A88.  This email message reflects that, even if Plaintiff attended a dinner with her colleagues, the nature of the dinner was personal, not

professional, and there is no indication that the dinner was mandatory. Gov't Resp. at 27–28. The second email that Plaintiff relies on to establish that she attended a mandatory dinner on November 19, 2013 only states,

> Last night we went to dinner ([two co-workers] and I) and it was not bad. She's actually been really great this trip . . . we got back to the hotel for a "hotwash" around 9:30 and were stuck working until 12 . . . from now on I'm legitimately claiming overtime since I was not allowed to leave, even after [she] made me explain to [another co-worker] that she [has] low self esteem . . . that was around 11:50.
>
> *        *        *
>
> Btw- still at work . . . no sign of leaving . . . and still have another "hotwash" tonight.

Pl. Mot. Ex. 15.

This email message does not substantiate that Plaintiff "worked anything other than a normal duty day prior to attending the dinner[,]" or that the dinner was a "working" dinner. Gov't Resp. at 28. If anything, it shows that Plaintiff spent approximately two and a half hours working after the dinner and was involved in a second "hotwash" on November 20, 2013. Gov't Resp. at 29. Plaintiff's pay records, however, also indicate that she requested and received overtime compensation for six hours of work for the period November 19–20, 2013. Gov't Resp. at 29 (citing Pl. Mot. Ex. 9 at 9; Gov't App. at A102–10).

### iv.        Conferences.

The Government argues that the undisputed evidence does not support Plaintiff's argument that she worked uncompensated overtime, when she attended conferences. Gov't Resp. at 33–34. This is so, because conference attendees did not necessarily attend all sessions and dinner was not required. Gov't Resp. at 36 (citing Pl. Mot. Ex. 12 at 24–25 (4/7/17 co-worker B testifying: "A lot of time we would go to dinner together. It was a choice. We could go to dinner or go on your own." and "[I]t all depended on whether or not you stayed for all the sessions.")). And, even if the attendees were required to attend "hotwashes" such meetings did not necessarily qualify as overtime, because as Plaintiff's co-worker testified, they could occur "during the conference, at the end of the conference[, or i]t could be after we got back to the office that we would sit down and have them. It all depends." Gov't Resp. at 37 (quoting Pl. Mot. Ex. 12 at 40 (4/7/17 co-worker B testimony)).

### v.        Vacation In France.

Although Plaintiff contends that the July 6, 2014 email message she sent after returning from a vacation in Paris, France evidences that she worked overtime while she was traveling, the email was sent after the fact and, according to Plaintiff's first-line supervisor, "'[s]ome things' does not mean work related." Gov't Resp. at 39 (citing Gov't App. at A69). Despite Plaintiff's reliance on a co-worker's testimony that he had "no reason either way" to know whether Plaintiff was working during her vacation, he was not Plaintiff's supervisor. Gov't Resp. at 39–40 (quoting Gov't App. at A53).

### vi.     Vacation In Greece.

Plaintiff's first-line supervisor testified: "We were hoping to nominate an employee for . . . [an] award, and [Plaintiff] wanted to voluntarily participate in that and help author it because she was a good writer.  So she said she would work on that on the plane voluntarily to help.  It was not a work assignment."  Pl. Mot. Supp. Ex. 11 at 182–83 (3/20/17 first-line supervisor testimony); Gov't App. at A64–65 (3/20/17 first-line supervisor testimony).  This evidences that Plaintiff voluntarily worked on this project on the plane, but did not reflect that Plaintiff otherwise worked while she was in Greece.  Gov't Resp. at 41.

### c.     Plaintiff's Reply.

Plaintiff replies that "voluminous testimony" corroborates that she worked overtime hours, without compensation.  Pl. Reply at 5.  Although the exact number of overtime hours that Plaintiff worked is an issue for trial, "the undisputed record shows that there are overtime hours that [she] worked without compensation."  Pl. Reply at 5.  But, the Government admits that Plaintiff worked for the CRST, who "worked excessively long hours" so "arguments that [Plaintiff correctly was classified] as exempt[, and also] compensated for every [alleged overtime] hour . . . that she worked[,] is not credible."  Pl. Reply at 6.

### d.     The Court's Resolution.

The party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact that would preclude granting summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("[T]he burden of the moving party [initially is] to show . . . the absence of a genuine issue concerning any material fact.") (citation omitted).  If the moving party demonstrates that there is no genuine issue of material fact, the burden of proof then shifts to the opposing party to establish that a genuine issue exists.  *See Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed. Cir. 1987) ("Where a movant has supported its motion with affidavits or other evidence which, unopposed, would establish its right to judgment, the non-movant may not rest upon general denials in its pleadings or otherwise, but must proffer countering evidence sufficient to create a genuine factual dispute.").  In the alternative, if the moving party establishes that there is no evidence to support an opposing party's case, then the burden of proof shifts to the opposing party to proffer evidence.  *See Celotex*, 477 U.S. at 325.  In evaluating this evidence, the court is required to resolve any doubts about factual issues in favor of the party opposing summary judgment.  *See Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed. Cir. 1985) ("In deciding whether summary judgment is appropriate, the trial judge should look beyond mere denials or arguments with respect to the factual determinations . . . and resolve all doubt over factual issues in favor of the party opposing summary judgment."); *see also H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed. Cir. 1984) (holding the nonmoving party "receive[s] the benefit of all applicable presumptions, inferences, and intendments"), *cert. denied*, 474 U.S. 818 (1985).

The FLSA requires that a federal employee must establish that each activity for which overtime compensation is requested constitutes "work."  *See Integrity Staffing Sols., Inc. v. Busk*, 135 S. Ct. 513, 516 (2014) ("But the FLSA did not define 'work' or 'workweek,' and [the Supreme Court] interpreted those terms broadly. It defined 'work' as 'physical or mental exertion (whether

burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business.'"). To constitute "work," the activity must be: (1) undertaken for the benefit of the employer (5 C.F.R. § 551.401(a)); (2) known or reasonably should have been known by the employer to have been performed (5 C.F.R. § 551.104); and (3) controlled or required by the employer (5 C.F.R. § 551.402(a)).

In this case, the Army Corps' overtime policy requires an employee to request overtime, either in advance or within a reasonable time after working the purported overtime hours. Pl. Mot. Ex. 10 at 17–18, 31. Plaintiff contends that the undisputed facts show that her supervisors were aware that she worked overtime. Pl. Mot. at 5–6 (citing Pl. Mot. Ex. 6 at 67 ("I discussed with [my first-line supervisor] that I would be staying late with [the CRST Leader]. . . . I would tell him when I returned from my trip [the CRST Leader] and worked extra hours when we were – when we were outside the office[]" but "[n]ot specific details. I would just inform him we worked late.")). It is important that Plaintiff *did not request overtime* for these instances. Gov't App. at A20, A22–26; *see also* Pl. Mot. Ex. 9 (time and attendance records typically showing no overtime during travel periods). The Army Corps' overtime policy, however, required specific approval and an explanation justifying why the work was mission critical. Pl. Mot. Ex. 10 at 17–18, 31; *see also* Pl. Mot. Ex. 3 at 89 (3/29/17 second-line supervisor testifying: "it's the policy that overtime shall be approved in advance, and there needs to be a justification for that requested time.")). But, the record does not reflect specific dates or times that Plaintiff allegedly worked late.[29]

Although Plaintiff relies on email messages sent after 3:30 p.m. to show that she worked overtime, those messages do not evidence that Plaintiff was working continuously from 7:00 a.m. until the emails were sent. For example, a July 19, 2012 email message states, "6:30 and I'm still here," but it was the last in a chain of emails sent to her sister during the preceding three hours, discussing non-work topics, such as Yahoo news stories and a pending trip to visit her sister. Pl. Mot. Ex. 45. Other email messages indicate that Plaintiff did no more than forward documents to other members of the CRST. *See, e.g.*, Pl. Mot. Ex. 21.

Construing the facts in the light most favorable to the Government, the court cannot infer that email messages sent after 3:30 p.m. establish that Plaintiff was working continuously until the time she sent them or that Plaintiff was working "overtime." *Cf. McClendon v. United States*, 127 Fed. Cl. 654, 659 (Fed. Cl. 2016) ("[P]laintiffs have not provided any evidence that they did not alter their regular workday on any of these occasions. Absent such information, it is impossible for this [c]ourt to determine that those emails were sent while the plaintiffs were working overtime."), *appeal dismissed per stipulation*, No. 2016-2609 (Fed. Cir. 2017). Likewise, the proffered deposition testimony does not establish that Plaintiff worked overtime. *See, e.g.*, Pl. Mot. Ex. 3 at 42 (3/29/17 second-line supervisor testifying that "[I]f you're asking was she sitting there at her desk throughout the time frame, 100 percent of the time from 7:00 to 6:00, the answer would be no."); Gov't App. at A36–37 (3/28/17 co-worker A testifying that although Plaintiff

---

[29] The email messages proffered that establish the number of hours spent on a given project on a given date coincide with dates for which Plaintiff received overtime or compensatory compensation. *See, e.g.*, Pl. Mot. Exs. 9 (showing overtime pay for November 19-20, 2013, and compensatory time for May 17–18, 2014), 15 (email discussing "hotwash" discussions on November 19 and 20, 2013), 43 (discussing working on May 17, 2014 for "10 straight hours").

could use her laptop to be available at all hours, he was unsure whether she did, because employees "would get emails from [the CRST Leader] any time he felt like sending one, BlackBerry, computer, whatever, [but his personal practice was to] get to it whenever [he] turned it on or got around to it"). Indeed, Plaintiff testified that she generally did not arrive to work until 7:30 a.m., thirty minutes *after* she was scheduled to begin work. Gov't App. at A21 ("My normal time was around 7:30 at the Fort Worth office."). Therefore, by Plaintiff's admission, she may have worked less than the required time on a regular basis.

Although Plaintiff testified that she worked through her lunch break every day (Pl. Mot. Ex. 6 at 49), there remains a genuine issue of material fact as to this issue. According to co-workers, Plaintiff occasionally ate lunch at her desk (Pl. Mot. Ex. 1 at 146 (3/20/17 co-worker A testimony)), but, that does not establish that Plaintiff was working at that time or that she was working overtime. Therefore, Plaintiff's assertion that material facts are not in dispute is not supported by the evidence. As such, a genuine issue of material fact remains as to whether Plaintiff worked compensable overtime work during her lunch break. Accordingly, Plaintiff is not entitled to summary judgment on this issue.

A genuine issue of material fact also remains as to whether any after-hours dinners that Plaintiff attended were "work." Pl. Mot. Ex. 6 at 67–68; Pl. Mot. Ex. 25; Gov't App. at A54. Plaintiff cites email messages about dinners the CRST Leader and other members of the CRST attended to establish that such dinners were required. Pl. Mot. at 7 (citing Pl. Mot. Ex. 13 (5/18/14 email sent at 5:42 p.m. from CRST Leader with subject "1830 lobby for din din? Interested?)). Those messages and testimony, however, discuss dinners that Plaintiff did and did *not* attend. In any event, it is not relevant whether Plaintiff was required to attend any dinners; the issue is whether any dinners she did attend were "work." *See* 5 C.F.R. §§ 551.104, 551.401(a), 551.402(a).

Plaintiff also contends she was required to attend working dinners at the end of each day for conferences she attended. Pl. Mot. Ex. 6 at 142. Even if such post-conference dinners were mandatory, they do not establish that Plaintiff is entitled to overtime compensation for them, because conference sessions were not required, so Plaintiff did not necessarily work eight hours prior to attending any dinners. *See* Pl. Mot. Ex. 12 at 24–25, 42. Accordingly, Plaintiff has not established the absence of a genuine issue of material fact as to whether she attended any post-conference dinners, or that they were required.

Plaintiff has not met the burden of proof to establish that there is no genuine dispute as to the material facts as to whether she worked overtime during her vacations in France and Greece. Although her family members testified that they witnessed her working during those trips and she was required to stay where internet access was available (Pl. Mot. Exs. 44 at 15–17, 7 at 20–21), this does not establish that her supervisors were aware she was working any alleged overtime. In any event, none of this proffered evidence establishes that Plaintiff was required to perform work for which she was entitled to compensable overtime.

In sum, the court has determined that Plaintiff failed to meet the burden of proof to establish that there is no dispute as to material facts regarding whether she worked overtime hours for which she was not compensated.

**IV.     CONCLUSION.**

For these reasons, Plaintiff's Motion For Partial Summary Judgment is denied.  The court will convene a telephone status conference on March 5, 2018 at 1:00 p.m., to set a date for this case to proceed to trial.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Chief Judge**